The COMMONWEALTH OF KEN-
TUCKY, ex rel. Steven L. BESHEAR;
Jefferson County, Kentucky; and River-
fields, Inc., Plaintiffs-Appellees, Cross-
Appellants,

v.

Clifford L. ALEXANDER, Jr.; Lieutenant
General John W. Morris, Chief of Engi-
neers, and Colonel Thomas Nack, Louis-
ville, District Engineer, Defendants,
Cross-Appellees,

and

Indiana Port Commission, Intervening
Defendant-Appellant, Cross-Appellee.

The COMMONWEALTH OF KEN-
TUCKY, ex rel. Steven L. BESHEAR;
Jefferson County, Kentucky; and River-
fields, Inc., Plaintiffs-Appellees,

v.

Clifford L. ALEXANDER, Jr.; Lieutenant
General John W. Morris, Chief of Engi-
neers, and Colonel Thomas Nack, Louis-
ville, District Engineer, Defendants-Ap-
pellants,

and

Indiana Port Commission, Intervening
Defendant.

Nos. 80–3452, 80–3503, 80–3610.

United States Court of Appeals,
Sixth Circuit.

Argued April 14, 1981.

Decided July 21, 1981.

John L. Smith, U. S. Atty., Hancy Jones, III, Asst. U. S. Atty., Louisville, Ky., James W. Moorman, Jacoques B. Gelin, Robert D. Clark, Peter Steenland, Dept. of Justice, Land & Natural Resources Div., Appellate Section, Washington, D. C., for defendants, cross-appellees.

Gerald Kirven, Louisville, Ky., Gary H. Baise, A. James Barnes, Beveridge, Fairbanks & Diamond, Carl Eardley, Washington, D. C., Theodore Sendak, Atty. Gen., David C. Weigel, Asst. Atty. Gen., State of Indiana, Indianapolis, Ind., for intervening defendant-appellant, cross-appellee.

Steven L. Beshear, Atty. Gen. of Ky., David K. Martin, Dale D. Brodkey, Asst. Attys. Gen., Frankfort, Ky., Lively M. Wilson, Stites, McElwain & Fowler, James D. Moyer, Louisville, Ky., Thomas L. Anderson, Max N. Edwards of Collier, Shannon, Rill, Edwards & Scott, Washington, D. C., for plaintiffs-appellees, cross-appellants and plaintiffs-appellees.

John L. Smith, U. S. Atty., Hancy Jones, III, Asst. U. S. Atty., Louisville, Ky., for defendants-appellants.

Before KEITH, BROWN and KENNEDY, Circuit Judges.

CORNELIA G. KENNEDY, Circuit Judge.

The Indiana Port Commission (IPC) appeals the judgment of the District Court which held inadequate the consideration of alternate sites in an environmental impact statement (EIS) prepared by the Army Corps of Engineers. Preparation and consideration of such an EIS was required prior to granting a permit to the Port Commission to build a port and industrial complex along the Ohio River at Six Mile Island near Jeffersonville, Indiana. The adequacy of the EIS was unsuccessfully challenged by the Commonwealth of Kentucky in several other respects and it has cross-appealed. Finding that the EIS was adequate in all respects, that the Corps did not abuse its discretion by limiting its consideration of alternate sites as it did, we reverse the judgment of the District Court.

The IPC is responsible for promoting the agricultural, industrial, and commercial development of Indiana through the construction of public port facilities. In 1971 it commissioned a study to determine the feasibility of building a port and industrial complex on the Ohio River in southeastern Indiana. A general review of the territory disclosed five areas in which the port might possibly be located. From east to west these were Aurora, Madison, Jeffersonville, New Albany, and Tell City.

The IPC then subjected each area to closer examination. One prerequisite was that

the locale have a work force of at least 50,000. Neither Aurora nor Madison had a work force of that size and accordingly both were eliminated from consideration. Tell City, Jeffersonville, and New Albany all had above average population and work force growth rates. However, Clark County, the most influential economic component in the Jeffersonville and New Albany region, had the highest growth rate in the state. This fact militated in favor of locating the port in one of those two cities. In addition, only Jeffersonville and New Albany showed substantial new industrial plant growth during a ten-year period prior to the study. The greatest increases in population, employment, manufacturing, and transportation services were forecast for the region of which Jeffersonville and New Albany are a part. Crucial to any port is the waterborne commerce it will handle, and the feasibility study showed that the Jeffersonville and New Albany region accounted for the largest share of Ohio River traffic and demonstrated the largest waterborne traffic growth rate. Thus, New Albany and Jeffersonville were selected as economically feasible alternative sites for the proposed port. Further examination of New Albany and Jeffersonville led to the selection of Six Mile Island as the optimal location for the port complex.

In April, 1974, the IPC applied for a permit from the Army Corps of Engineers to construct the proposed facility, to be known as the Clark Maritime Center, at Six Mile Island. The Corps held in abeyance the processing of the permit application pending preparation of an EIS. It circulated a draft EIS in October, 1975. The discussion of alternatives in the draft EIS consisted of the list of site selection criteria employed in the 1971 feasibility study and the conclusory statement that "[t]he only other site [other than Six Mile Island] in the Indiana part of the [area under consideration] that is suitable for similar development is located southwest of New Albany, Indiana along SR 111." A public hearing was held on the draft EIS in May, 1976. The Corps received several comments from federal agencies and others to the effect

that the limited discussion of alternative sites was inadequate under the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 et seq.

The Corps published a final EIS in March, 1977, copies of which were made public with interested parties given thirty days to comment. In response to criticisms of the draft EIS the Corps significantly expanded the discussion of alternatives in the final EIS. In essence, the final EIS recounted the search for an economically feasible site that was conducted in 1971. The EIS stated that the Jeffersonville-New Albany region was determined to have the best population growth rate and new employment potential, and of the areas studied it showed by far the greatest increase in volume of port traffic during the study period. It was noted that travel time and freight charges would be increasingly higher if the port were located outside the Jeffersonville-New Albany area. The final EIS then discussed in detail various alternative sites around Jeffersonville and New Albany. It also contained the Corps' responses to comments it had received on the discussion of alternatives in the draft EIS.

Kentucky did not use the thirty-day comment period to object to the discussion of Tell City, Aurora, or Madison in the final EIS. Kentucky has not shown us or the District Court, and we have not found, a single comment by any party at any time before the start of this litigation to the effect that the discussion of Tell City, Aurora, or Madison as alternatives in the final EIS was inadequate. The Corps held two more public hearings, reviewed the permit application, and ultimately granted the permit in June, 1979.

Kentucky brought this suit against the Corps in the Western District of Kentucky in August, 1979. The complaint alleged, inter alia : that the final EIS gave inadequate consideration to Aurora, Madison, and Tell City as alternatives to Jeffersonville and New Albany; that the Corps should have considered a proposed port in Louisville as an alternative to the IPC port in Indiana; that the Corps did not properly

consider the environmental impact of increased erosion at Six Mile Island; that the Corps did not consider the environmental impact of barge parking; that the Corps included in the assessment of the economic benefits of the proposed IPC port the effect of a highly speculative highway bridge across the Ohio River; and that the Corps assumed that the port would handle petroleum products when determining whether the port was economically feasible, but did not discuss the environmental impact of oil spills that might result. The IPC was permitted to intervene as a party defendant.

The IPC and the Corps moved for summary judgment. The District Court ruled in favor of Kentucky that the EIS did not adequately discuss Tell City, Aurora, or Madison. The District Court recognized that under *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Counsel, Inc.*, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978), Kentucky had an obligation to raise its challenge before the Corps, and it had not done so. However, the District Court went on to hold that Kentucky's failure to participate did not relieve the Corps of its statutorily imposed duty under NEPA to discuss alternatives to its proposed action. The District Court ruled in favor of the Corps and the IPC on all other issues. This appeal and cross-appeal followed.

 Section 102(2) of NEPA, 42 U.S.C. § 4332(2), requires

all agencies of the Federal Government [to]— . . .

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on— . . .

(iii) alternatives to the proposed action . . . .

NEPA does not require a federal agency to discuss every conceivable alternative to a proposed action, however. "To make an impact statement something more than an exercise in frivolous boilerplate the concept of alternatives must be bounded by some notion of feasibility." *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. at 551, 98 S.Ct. at 1215.

The agency charged with drafting an EIS must make the initial determination which alternatives are feasible and merit consideration. Clearly then, "[t]he specificity of EIS treatment of alternatives is a matter of agency discretion." *North Slope Borough v. Andrus*, 642 F.2d 589, 601 (D.C.Cir.1980). Accordingly, this Court may only inquire whether the Corps' consideration of Tell City, Aurora, and Madison was so inadequate as to be an abuse of this discretion.

 *Vermont Yankee* counsels that a significant factor in whether the specificity of an agency's examination of alternatives is an abuse of discretion is how meaningful was the participation in agency proceedings by intervenors:

[W]hile it is true that NEPA places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action, it is still incumbent upon intervenors who wish to participate to structure their participation so that it is meaningful, so that it alerts the agency to the intervenors' position and contentions.

435 U.S. at 553, 98 S.Ct. at 1216. *See Seacoast Anti-Pollution League v. Nuclear Regulatory Commission*, 598 F.2d 1221, 1229–1230 (1st Cir. 1979). In contrast to the negative response to the Corps' treatment of Tell City, Aurora, and Madison in the draft EIS, the Corps did not receive a single comment after publication of the final EIS, either during the comment period or within a reasonable time thereafter, to indicate that its discussion of the three sites was inadequate. Thus, Kentucky clearly did not meet its obligation of meaningful participation by informing the Corps of the state's position at a time when the Corps could have taken any necessary corrective action without undue delay, nor has that obligation been satisfied by others.

 Agency consideration of alternatives in the administrative record cannot

replace the NEPA mandated discussion of alternatives in the EIS itself. *Grazing Fields Farms v. Goldschmidt*, 626 F.2d 1068 (1st Cir. 1980). But where potential alternatives are not discussed in detail in the EIS because they are not feasible, the evidence of infeasibility need not be found within the EIS itself. Rather, a court may look at the administrative record as a whole to see whether an alternative deserved greater attention in the EIS. *Id.* at 1074. Neither the final EIS nor the original feasibility study give any indication that Tell City, Madison, or Aurora were realistic alternatives to the Jeffersonville site. In fact, both indicate that they were not feasible. Kentucky has not challenged the criteria by which the three cities were eliminated from consideration, nor has it challenged the manner in which those criteria were applied to the three cities. Further, Kentucky has offered no evidence whatsoever to establish that any of the three cities is a feasible alternative.

The Commonwealth of Kentucky attempts to rely on a statement in the final EIS discussion of alternatives that

> [Aurora, Madison, and Tell City] remain as possibilities for future development by the Indiana Port Commission. Each of these areas exhibited strong growth potential which in the future might justify a port development in their vicinities.

Kentucky would have us draw from this the conclusion that the Corps itself identified these three cities as feasible alternatives, and thus was under an obligation to consider the environmental impact of locating the proposed port at each. To the contrary, the only reasonable conclusion to draw from the statement that a port might someday be justified at Aurora, Madison, or Tell City, is that a port cannot presently be justified there. Rather than supporting Kentucky's position, the quoted statement cuts against it.

■ The Corps' discussion in the final EIS of why the eliminated port sites were not economically feasible might have been more complete and less conclusory. However, on the facts of this case and considering the record as a whole, we do not think that the specificity of the Corps' treatment of alternatives shows an abuse of discretion. The District Court's opinion did not discuss the preliminary issue whether the proposed alternatives to New Albany and Jeffersonville were feasible. Thus, the District Court erred in concluding that the discussion of alternatives did not comply with the mandate of NEPA.

■ Kentucky argues strenuously that the Corps has conceded the inadequacy of its discussion of alternative locations, and that it and the IPC are now bound by that concession and may not appeal the District Court's ruling. In its initial brief on appeal, the Corps recognized that the District Court had found the EIS inadequate. The Corps apparently made a tactical decision that it would be cheaper and faster simply to revise the EIS to remove the District Court's objections than to prosecute this appeal, and the Corps wrote its appellate brief based on this assumption. Intervenor IPC felt otherwise, and chose to appeal the District Court's decision rather than face the expense and delay of another EIS. The Corps ultimately acceded to the IPC's wishes, withdrawing its offer to compile a third EIS. At no time did the Corps concede that the final EIS was inadequate. It simply stated that the District Court had found it so. Kentucky does not allege that it has been prejudiced in any way by this turn of events. The Corps and the IPC did not lose their right to appeal through the Corps' now-withdrawn offer to revise the EIS.

Kentucky next argues that the Corps should have considered a port proposed by the Louisville and Jefferson County Riverport Authority, to be built on the Kentucky side of the Ohio River, as an alternative to building a port in Indiana at Six Mile Island. The Louisville port was first suggested as an alternative by the Environmental Protection Agency (EPA) after the draft EIS was published, at which time the Louisville port was under discussion but no firm steps towards its construction had been taken. In the final EIS the Corps stated, in

response to the EPA's comment, that whereas no permit had yet been sought for the Louisville port the Corps regarded it as too speculative to be considered as an alternative. Indeed, Louisville did not file a permit application for its proposed port until 1979, two years after the Corps completed the final EIS for the Clark Maritime Center. No party raised this issue to the Corps after publication of the final EIS.

■ As the Third Circuit has observed: In the absence of an active, as distinguished from a purely speculative, proposal from a responsible public agency, with power and responsibility in the area ... "there is nothing that could be the subject of the analysis envisioned by [NEPA] for an impact statement."

*Coalition for Responsible Regional Development v. Coleman,* 555 F.2d 398, 402 (4th Cir. 1977) (citation omitted).

■ We do not purport to adopt a per se rule that a permit application must be on file in order for a proposal to be "active" and thus a necessary part of an EIS discussion of alternatives. However, on the facts of this case, particularly where Kentucky never urged the Louisville port as an alternative to the Clark Maritime Center in a comment on either the draft or the final EIS, we cannot say that the Corps abused its discretion by giving the Louisville proposal the scant attention that it did.

The Commonwealth of Kentucky unsuccessfully challenged several additional aspects of the EIS. One issue arose from the fact that construction of the Clark Maritime Center will require widening the channel between Six Mile Island and the Indiana shore. Kentucky argues that the Corps gave inadequate consideration to the potential problem of increased erosion of Six Mile Island that might result.

■ To calculate the increase in erosion, the Corps operated a tug of the type that would use the channel and which pulled test equipment while divers took various measurements. The Corps also commissioned a study of the problem by the Hydraulics and Water Resources Laboratory, School of Civil Engineering, Purdue University. The conclusion of both studies was that widening the channel would not significantly increase erosion of the Island. Kentucky has given absolutely no indication that the Corps abused its discretion by relying on the Purdue study or its own. Kentucky does not claim to have challenged either study during the agency proceedings. The only contrary evidence it offers is evidence it is introducing for the first time in the federal courts—an affidavit from another expert questioning the methodology of and conclusion reached by the Purdue study.

■ The Corps' finding must be accepted unless it is arbitrary. 5 U.S.C. § 706(2)(A). While Kentucky argues that there exists a factual dispute whether the Corps' conclusion is correct, it has offered no evidence that the Corps gave insufficient consideration to the problem of erosion. Mere disagreement among experts will not serve to invalidate an EIS. *Life of the Land v. Brinegar,* 485 F.2d 460, 472–473 (9th Cir. 1973), *cert. denied,* 416 U.S. 961, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974). Since reasonable persons could rely on the Corps' studies to reach the Corps' conclusion, the conclusion is not arbitrary.

■ Kentucky next argues that the Corps gave insufficient consideration to the environmental impact of parking barges near the port. Kentucky has not proffered any evidence, either to us or to the Corps, that barge parking has a significant environmental impact. Its conclusory allegation is not sufficient to withstand the Corps' motion for summary judgment on this issue. *See Vermont Yankee, supra; see also, Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971).

■ Finally, Kentucky makes two arguments that are refuted by the EIS itself. First, it argues that the Corps assumed, for the purpose of evaluating the economic viability of the proposed Indiana port, that a highly speculative interstate highway bridge would in fact be built across the Ohio River, and that this had the effect of overstating the potential economic benefit of the Clark Maritime Center. To the con-

trary, as the District Court observed, the EIS recognizes that construction of the bridge is "speculative at best." Kentucky also argues that for the purpose of determining the port's economic viability the Corps assumed that the port would handle petroleum products, while no consideration was given to the danger of spills when the Corps was discussing the environmental impact of the port. This claim is simply untrue. The EIS stated that groundwater contamination by petroleum products will be minimized by impermeable layers on the floor and sides of bulk storage facilities, and by diversion of runoff to a treatment facility. The EIS also stated that, if and when petroleum is handled by the Clark Maritime Center, the IPC will obtain all required permits and develop a spill contingency plan. The final EIS considers the environmental impact of "the port"—it does not state the environmental impact of each item the port will handle. While the EIS might have considered the problem of oil spills more fully, the Corps did not abuse its discretion by treating the problem as it did.

That part of the District Court's judgment finding that the final EIS inadequately discussed Tell City, Aurora, and Madison, is reversed. The balance of the District Court's judgment is affirmed.