ATLANTIC TERMINAL URBAN RE-
NEWAL AREA COALITION, John
Theodore Glick, Anne McClellan, Lo-
raine Oliver, and Mildred Davis, Plain-
tiffs,

v.

NEW YORK CITY DEPARTMENT OF
ENVIRONMENTAL PROTECTION;
New York City Public Development
Corporation; New York City Board of
Estimate; David N. Dinkins; Albert
Appleton; New York City Planning
Commission and Sylvia Deutsch, De-
fendants.

No. 87 Civ. 4242 (MEL).

United States District Court,
S.D. New York.

June 28, 1990.

Edward Copeland, Elizabeth St. Clair,
Rabinowitz, Boudin, Standard, Krinsky &
Lieberman, P.C., New York City, for plain-
tiffs.

Victor A. Kovner, Corp. Counsel of the
City of New York (Antonia Levine, John de
Angeli, Susan Shapiro, of counsel), New
York City, for Mun. defendants.

Kaye, Scholer, Fierman, Hays & Handler
(Richard C. Seltzer, Stanley N. Alpert, Cecil
J. North, III, of counsel), New York City,
for amicus curiae Rose Associates.

LASKER, District Judge.

This is a citizen suit brought under the
Clean Air Act, 42 U.S.C. § 7604(a) (1982), to
enforce air quality standards in the area
surrounding the Atlantic Terminal and
Brooklyn Center Projects (collectively the
"Atlantic Terminal Project" or "Project"), a
proposed development in downtown Brook-

lyn.[1] The plaintiffs (collectively "ATU-RA") claim that the Project will cause serious new violations and exacerbate existing violations of National Ambient Air Quality Standards for carbon monoxide (the "NAAQS" or the "standards") by increasing automobile traffic in the area and that New York City has not fulfilled its commitment to ensure attainment of the standards. ATURA also seeks to amend its complaint to add a claim under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332 et seq. (1982), alleging that the final environmental impact statement for the Project (the "FEIS") was based upon incorrect assumptions and information which caused it to underestimate the effect of the Project on air quality.

## I.

The Environmental Protection Agency ("EPA") is required by the Clean Air Act to promulgate NAAQS for certain harmful pollutants, including carbon monoxide. 42 U.S.C. § 7409(b)(2) (1982). The NAAQS, which govern the concentration of a pollutant in the air, must be set at a level below which the EPA administrator judges the pollutant is to be kept to safeguard human health. 42 U.S.C. § 7409(b)(1) (1982). The Clean Air Act requires each state to adopt a state implementation plan ("SIP") that provides for the "implementation, maintenance, and enforcement" of the NAAQS and to submit its SIP to the EPA for approval. 42 U.S.C. § 7410(a)(1) (1982). The New York SIP, which commits the state to secure major reductions in carbon monoxide concentrations in the New York City metropolitan area to achieve the NAAQS, was approved by the EPA.

NEPA requires that an environmental impact statement ("EIS") be prepared in connection with any major federal action significantly affecting the quality of the human environment. 42 U.S.C. § 4332(2)(C) (1982). Part of the New York SIP includes a commitment by New York City ("the defendants" or "the City") that:

> To further insure that the carbon monoxide standard is attained in New York City, if an EIS [Environmental Impact Statement] for a project proposal identifies a violation or exacerbation of the carbon monoxide standard [NAAQS], then the City commits to assure that mitigating measures will be implemented by the project sponsor or City, so as to provide for attainment of the standard by December 31, 1987 and maintenance of it thereafter.[2] ("the City's commitment")

The defendants earlier moved to dismiss this case on the grounds that the suit was not permitted under the citizen suit provision of the Clean Air Act, a provision authorizing suits to compel compliance with emission standards or limitations of a SIP. The City argued that its commitment, cited above, did not constitute "an emission standard or limitation" as that term is defined in 42 U.S.C. § 7604(f) (1982). We found jurisdiction because of the City's commitment to "take affirmative, although unspecified, steps to achieve the standard." *Atlantic Terminal Urban Renewal Area Coalition v. New York City Dept. of Environmental Protection*, 697 F.Supp. 157, 161 (S.D.N.Y.1988).

The parties have each moved for summary judgment. ATURA claims that the defendants have repudiated the City's commitment. The defendants argue that they have fulfilled that commitment.

## II.

It is necessary to define the precise nature of the City's commitment in order to determine whether or not that commitment has been fulfilled. The relevant provision of the SIP has a simple conditional construction: if X occurs, then the City commits to do Y. The parties are in agreement

---

1. The Project has been the subject of previous opinions of this court, reported at 697 F.Supp. 666 (Sept. 29, 1988), 697 F.Supp. 157 (Oct. 7, 1988), 700 F.Supp. 173 (Nov. 21, 1988), 705 F.Supp. 988 (Feb. 7, 1989), and 709 F.Supp. 502 (April 17, 1989).

2. Complaint (June 17, 1987), Exhibit A, New York State Air Quality Implementation Plan ("SIP"), Amended January 1984, § 3.6(A).

that X, the condition that triggers the City's commitment, has occurred: the FEIS for the Atlantic Terminal Project identified a number of violations and exacerbations of the NAAQS. The FEIS predicted that, with or without the Project, carbon monoxide concentrations at thirteen locations in the area surrounding the Project would exceed the NAAQS in 1988 and 1991.[3]

In light of those unequivocal findings, both parties agree that the City has become committed to "assure that mitigating measures will be implemented by the project sponsor or the City, so as to provide for attainment of the standard." Both parties interpret this commitment to mean that the City must affirmatively act to adopt mitigation measures adequate to bring the area into compliance. They part company, however, over the issue of the significance of the December 31, 1987 date mentioned in the City's commitment. ATURA claims that it is entitled to summary judgment because the defendants admit that they did not assure that mitigation measures would be implemented so as to attain the NAAQS by December 31, 1987. The defendants argue that the December 31, 1987 date merely restates the statutory goal for attainment of the NAAQS and was not intended to bar a project such as the Atlantic Terminal Project for which mitigation by December 31, 1987 would not have been feasible and whose mitigation measures will attain the NAAQS within a reasonable time after that date.

In the FEIS, the City outlined mitigation measures designed to offset any violations or exacerbations of the carbon monoxide standard caused by the Project. Mitigation measures proposed in the FEIS include adjustment of traffic signal timing, transformation of certain parking or standing lanes into moving lanes during peak travel periods, separation of conflicting traffic movements into definite paths of travel using pavement markings or raised islands, street widening and deployment of traffic enforcement agents.[4] According to the FEIS, "with traffic mitigation the proposed project will have no significant air quality impacts."[5] However, the FEIS also states that the mitigation measures it outlines will not be sufficient to mitigate significant traffic impacts from other sources. With those mitigation measures in place, the FEIS predicts that 11 sites in the Project area will still violate the NAAQS in 1988 and 1991.[6] The FEIS itself states, "[C]arbon monoxide concentrations at these locations will not be in conformance with the SIP with or without the project, or with the project with its mitigation."[7]

The defendants acknowledge that § 3.6(A) of the SIP requires them to commit to assure that attainment measures will be implemented not only for exceedances caused by the Project but also for exceedances not caused by the Project which are revealed through the EIS process. Accordingly, the City has developed a comprehensive traffic management plan for the downtown Brooklyn area (the "Downtown Brooklyn Master Plan" or "DBMP") to fulfill its SIP commitment. The DBMP addresses the potential impacts of a number of projects expected to be built by 1988 and 1992 and includes mechanisms for eliminating pre-existing exceedances that were revealed in the FEIS. The DBMP outlines a combination of engineering and street improvement measures designed to correct traffic congestion problems in downtown Brooklyn so as to achieve the NAAQS.[8] The City has stated its intention to implement these improvements and the necessary expenditures have been approved as part of the City's capital budget plan for

---

3. Complaint, Exhibit B, Atlantic Terminal and Brooklyn Center Projects Final Environmental Impact Statement, August 1986 ("FEIS") at II.G–14.

4. FEIS at IV–5—IV–6, IV–19—IV–21.

5. *Id.* at IV–32.

6. *Id.* at IV–21.

7. *Id.* at IV–32.

8. Affidavit of Ross Sandler in Opposition to Plaintiffs' Motion for a Preliminary Injunction and in Support of Municipal Defendants' Cross-Motion for Summary Judgment ("Sandler Affidavit") (Jan. 27, 1989) at ¶ 5.

fiscal years 1989–92.[9]

Putting aside for the moment the issue of the significance of the December 31, 1987 deadline mentioned in the SIP, the narrow but critical issue to be determined is whether the FEIS and the DBMP convincingly establish that the NAAQS will be attained within the time frame they establish.

The FEIS states that the mitigation measures it proposes will offset any exceedances or exacerbations of the NAAQS caused by the Atlantic Terminal Project. ATURA disputes that statement and claims that the FEIS both understates the effects of the Project on air quality and overstates the efficacy of the proposed mitigation measures. ATURA contends that in order to minimize both the current level of carbon monoxide and the Project's effect on it the defendants have relied on data which they knew to be incorrect.

The DBMP states that the mitigation measures it proposes will, in conjunction with the measures proposed in the FEIS, achieve the NAAQS by 1993. ATURA claims that the DBMP attainment measures, even if implemented on schedule, will not be sufficient to eliminate exceedances of the NAAQS in the Project area.

ATURA argues that there are four defects in the FEIS and DBMP which it claims resulted in a severe understatement of the future carbon monoxide concentrations in the Project area: 1) the FEIS overestimated the beneficial results of two emissions reductions programs: the New York State Vehicle Inspection and Maintenance Program and the New York State Mechanics Training Program; 2) the FEIS compared the "build" and "no-build" alternatives in a deceptive manner by analyzing the "no-build" alternative without the proposed DBMP attainment measures; 3) the DBMP measures will not be completed on schedule; and 4) the predictions of future carbon monoxide levels in the DBMP are overly optimistic due to the use of mathematical equations known as the "CHI methodology" and the "imputed v/c ratio."

III.

At the outset, the defendants answer that because ATURA failed to challenge the methodologies and assumptions contained in the FEIS during the environmental impact statement ("EIS") process, they may not do so here. ATURA responds that certain methodologies used in the FEIS and the DBMP did not appear in the draft environmental impact statement (the "DEIS") and therefore could not have been challenged by them during the EIS process. Moreover, ATURA notes that the DBMP was not published until after the EIS process had concluded.

While substantial support exists for the defendants position that challenges to the EIS should be raised during the EIS process, *see, e.g., Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 553, 98 S.Ct. 1197, 1216, 55 L.Ed.2d 460 (1978) (intervenors are obligated to structure their participation so that it alerts administrative agency to their contentions), a number of courts, when confronted with untimely challenges to an EIS, have chosen nevertheless to evaluate the merits of those challenges, which often implicate important public interests, and to consider the plaintiffs' failure to raise the objections earlier as a factor in evaluating those objections. *See, e.g., Kentucky ex rel. Beshear v. Alexander,* 655 F.2d 714, 718 (6th Cir.1981) (merits of plaintiff's objections to EIS considered even though plaintiff "clearly did not meet its obligation of meaningful participation"); *Citizens Committee Against Interstate Route 675 v. Lewis,* 542 F.Supp. 496, 526–27 (S.D.Ohio 1982) (merits of claim based on alleged inadequacies of FEIS considered despite plaintiff's delay in making claim); *Woida v. United States,* 446 F.Supp. 1377, 1389 (D.Minn.1978) (lack of comments by plaintiffs concerning draft EIS butresses court's conclusion that EIS is adequate); *County of Suffolk v. Secretary of Interior,* 562 F.2d 1368, 1385 (2d Cir.1977), *cert. denied,* 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978) (new evi-

**9.** *Id.* at ¶ 7.

dence properly admitted in district court, although plaintiffs' failure to offer it during EIS process might cast reflections upon its probative significance); *California v. Bergland,* 483 F.Supp. 465 (E.D.Cal.1980) ("laches and failure to exhaust administrative remedies are disfavored doctrines in NEPA cases"). Accordingly, although the statutory and regulatory structure contemplates that, if possible, ATURA's concerns should have been raised and answered at an earlier stage, each of its concerns, set forth in detail in the appendix to this opinion, has been thoroughly reviewed to determine whether any of them would justify this court's interference.

■ With regard to the issues raised by ATURA, both parties have put before this court material that was not available to the agencies that prepared and reviewed the Atlantic Terminal EIS. In reviewing agency action, a court may not engage in a review of material not before the agency. *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973) ("the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court"). Nevertheless,

> ... allegations that an EIS has neglected to mention a serious environmental consequence, failed adequately to discuss some reasonable alternative, or otherwise swept "stubborn problems or serious criticism ... under the rug" ... raise issues sufficiently important to permit the introduction of new evidence in the district court, including expert testimony with respect to technical matters, both in challenges to the sufficiency of an environmental impact statement and in suits attacking an agency determination that no such statement is necessary.

*County of Suffolk v. Secretary of Interior,* 562 F.2d 1368, 1385 (2d Cir.1977), *cert. denied,* 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978) ATURA alleges that in the FEIS, stubborn problems have been swept under the rug. Accordingly, the "new evidence" has been considered in light of the Court of Appeals' observation that it would be "probative only insofar as

it tended to show either that the agency's research or analysis was clearly inadequate or that the agency improperly failed to set forth opposing views widely shared in the relevant scientific community." 562 F.2d at 1385.

## IV.

ATURA argues that summary judgment in favor of the municipal defendants is inappropriate at this time because there is a disputed issue of material fact as to whether the City's methodology for predicting future carbon monoxide concentrations was reasonable. Although it is beyond question that a dispute exists as to the reasonableness of the methodology employed in the FEIS, it does not follow that a dispute over reasonableness precludes summary judgment. While there may be disputed issues of material fact which need to be resolved before a court can reach a legal conclusion as to reasonableness, the issue of reasonableness itself is not an issue of material fact.

Summary judgment is appropriate if the court can fairly decide the case on the evidence before it and the evidence before it would not be meaningfully enhanced by a trial. If a trial were held in this case, it would apparently consist of the testimony of the witnesses whose affidavits are already in the record, in which they would simply verify the opinions they have expressed in those affidavits. The parties' experts have engaged in cross-examination by addressing each other's arguments in affidavits and reply affidavits. Neither side has suggested that a trial would substantially illuminate the question of whether the City's claim that the measures outlined in the FEIS and in the DBMP are sufficient to attain the NAAQS is reasonable.

As explained above, ATURA alleges that certain defects in the FEIS air quality analysis, known to the City at the time it approved the FEIS, resulted in drastic underpredictions of carbon monoxide concentrations in the FEIS. ATURA's challenge to the adequacy of the FEIS, which forms the core of its Clean Air Act claims, overlaps substantially with its proposed claim

under NEPA. Both claims require the court to determine whether the City, through the EIS process, "has taken a 'hard look' at the environmental consequences" of the Atlantic Terminal Project. *Sierra Club v. United States Army Corps of Engineers*, 701 F.2d 1011, 1029 (2d Cir. 1983) (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730 n. 21, 49 L.Ed.2d 576 (1976)). Accordingly, the discussion which follows is applicable to both claims.

The defendants argue that ATURA seeks to have the court arbitrate scientific disputes irrelevant to whether the FEIS took the requisite "hard look" at potential environmental effects. The defendants assert that the court should defer to the EPA's determination of scientific and technical issues in approving the FEIS and the DBMP and not choose among conflicting experts' testimony.

The Court of Appeals has stated:

In order to fulfill its role, the EIS must set forth sufficient information for the general public to make an informed evaluation; and for the decisionmaker to consider fully the environmental factors involved and to make a reasoned decision after balancing the risks of harm to the environment against the benefits to be derived from the proposed action.

*Sierra Club*, 701 F.2d at 1029. The role of the courts in reviewing an EIS is limited to ensuring that these basic requirements have been met. "A court may not rule an EIS inadequate if the agency has made an adequate compilation of relevant information, has analyzed it reasonably, has not ignored pertinent data, and has made disclosures to the public." 701 F.2d 1011, 1029 (2d Cir.1983) On the other hand,

[i]f the district judge finds that the agency did not make a reasonably adequate compilation of relevant information and that the EIS sets forth statements that are materially false or inaccurate, he may properly find that the EIS does not satisfy the requirements of NEPA in that it cannot provide the basis for an informed evaluation or a reasoned decision. Further, the court may properly be

skeptical as to whether an EIS's conclusions have a substantial basis in fact if the responsible agency has apparently ignored the conflicting views of other agencies having pertinent expertise.

*Id.* at 1039.

■ In light of this standard, disagreement among experts as to the validity of methodologies or findings in an EIS does not preclude summary judgment because such conflicts do not render the FEIS analysis unreasonable. The Court of Appeals in *Kentucky ex rel. Beshear v. Alexander*, 655 F.2d 714 (6th Cir.1981) upheld the district court's grant of summary judgment in favor of defendants stating:

While [plaintiff] argues that there exists a factual dispute whether the [EIS] conclusion is correct, it has offered no evidence that the [EIS] gave insufficient consideration to the problem of erosion. Mere disagreement among experts will not serve to invalidate an EIS.... Since reasonable persons could rely on the [EIS] studies to reach the [EIS] conclusion, the conclusion is not arbitrary.

655 F.2d at 720.

■ The dueling affidavits of the experts on both sides in this case do demonstrate the existence of a scientific dispute as to the best methodology for measuring future carbon monoxide concentrations; this court does not have the authority to resolve that dispute. It is not necessary to decide that the defendants' experts are indisputably correct in order to grant summary judgment in favor of the defendants, but merely that the analysis and conclusions of the FEIS are reasonable.

The court may not substitute its judgment for that of the decisionmakers. Nevertheless, the court is obligated to examine the choice of methodology and the assumptions contained therein to determine whether the model is a reasonable analytic tool that takes account of the pertinent data. *Sierra Club*, 701 F.2d at 1029; *County of Suffolk*, 562 F.2d at 1385.

## V.

ATURA bases its criticisms of the DBMP and the FEIS primarily on two affidavits

from Daniel Gutman, an experienced consultant in the fields of traffic and air pollution. From 1978–81, Gutman was chief traffic and air quality analyst for the EPA with regard to the then-proposed West Side Highway Project. Since 1981, Gutman has served as an air pollution and traffic consultant to a variety of public and private organizations. Although Gutman has raised questions about the FEIS and the DBMP which appropriately prompt a careful scrutiny of the material submitted by both parties, we come away from that examination with a comfortable conviction that the defendants have demonstrated that their efforts were reasonable and that there is a reasonable probability that the measures they propose will achieve the NAAQS.

Assessment of the reasonableness of the methodologies used and the conclusions reached in the FEIS and the DBMP begins with a thorough review of the documents themselves. Both the FEIS and the DBMP reflect the careful efforts of skilled professionals to grapple with complex technical issues. Detailed tables and maps are complemented by narrative explanations of the reasons why certain methodologies were chosen and the conclusions reached. Although the documents demonstrate a sophisticated understanding of air quality analysis, they are clear and accessible to decisionmakers who may not have very much familiarity with the technical details.

The FEIS and the DBMP paint a far from rosy picture of the air pollution situation in the Project area. Indeed, one comes away from reading them with an acute sense of the enormity and complexity of the carbon monoxide problem in downtown Brooklyn. The frank acknowledgment of the seriousness of the situation presented in both the DBMP and the FEIS is more consistent with the "hard look" required by federal environmental statutes than with the deceptive practices intended to fool the regulators and the public alleged by Gutman.[10]

Moreover, there can be no doubt that in these documents, the City, rather than walking away from its SIP commitment, undertakes to implement significant, large-scale measures reasonably calculated to achieve the NAAQS.

Numerous detailed affidavits from highly qualified experts lend substantial credibility to the methods used and the conclusions reached in the FEIS and the DBMP. Ross Sandler, former Commissioner of the New York City Department of Transportation ("DOT"), explains in his affidavit the purpose and structure of the DBMP and the DOT's responsibility for implementing most of its measures. Sandler also details the current status and anticipated dates of commencement of each element of the DBMP.

The affidavit of Robert Conway, Professional Engineer and Vice–President of one of the consulting firms that prepared the air quality studies in the FEIS, answers in detail Gutman's criticisms of the FEIS methodology. Over the last seven years, Conway, who has completed graduate-level research and course work at Princeton University in mathematical modelling in environmental science, has conducted approximately 100 air quality analyses in New York City, as well as an assessment of air quality evaluation methodology for the New York City Quality Review. Conway explains the development of the imputed v/c methodology and points out ways in which he believes Gutman has misunderstood the relationship between the DBMP and the FEIS and the methodologies employed in each.[11]

Gail Benjamin, former Director of the Office of Environmental Impact and the City Environmental Quality Review Director of the New York City Department of Environmental Protection ("DEP") submitted an affidavit which explains the City's environmental review of the Project. The DEP and New York City Department of City Planning ("DCP") determined

---

**10.** *See, e.g.* Gutman Declaration at ¶ 9.

**11.** Affidavit of Robert Conway in Opposition to Plaintiffs' Motion for a Preliminary Injunction

and in Support of Municipal Defendants' Motion for Summary Judgment ("Conway Affidavit") (January 25, 1989) at ¶¶ 3–12.

whether the EIS prepared by outside consultants was thorough and complete.[12] The DEP and DCP commented on the appropriateness of the methodologies and analyses used and indicated which aspects of the review should be approached differently.[13] Other City agencies, such as the DOT, were involved where applicable and all such agencies continuously corrected and approved the analyses throughout the preparation of the EIS and such corrections were incorporated into each new submission.[14] Benjamin states that the DEP and the DCP, working with a number of environmental consultants, found that the air quality analyses in the FEIS were reasonable.[15] The DOT and the DCP found the traffic mitigation proposed to be effective in increasing traffic capacities or speeds.[16]

Benjamin also explains the selection of the CHI methodology and the imputed v/c methodology used in the FEIS and the DBMP and points out a number of flaws in Gutman's understanding of the methodologies and how they were employed.[17] She describes the reasoning behind the decision to give full credit for the Inspection and Maintenance and Mechanics Training Programs and the choice of which mitigation measures to include in the "no build" scenario.[18]

An affidavit was also submitted by Michael Horodniceanu, former Deputy Commissioner for Traffic Operations and head of the Bureau of Traffic for the DOT. As a principal at Urbitran Associates, the consulting firm that prepared the DBMP, Horodniceanu was in charge of the traffic studies and air quality analyses done in connection with the DBMP. Horodniceanu, who received a masters degree in Engineering Management from Columbia University and a Ph.D. in Transportation Engineering and Planning from Polytechnic Institute of New York, has been a member of the faculty of Polytechnic and Manhattan College and worked on transportation engineering projects under Federal, State and City grants. He has actively participated in traffic studies and analyses for many projects in New York City, including Lincoln West, the Times Square Redevelopment Project and Metrotech. Horodniceanu explains in detail why he believes Gutman is mistaken when he alleges that the CHI and imputed v/c methodologies are wrong and lead to inaccurate results. Horodniceanu declares:

> The City appropriately determined that the CHI methodology was the one best adapted for use in downtown Brooklyn when the Project's EIS was prepared. Indeed, the development of a new methodology takes years of analysis and study, as was true with the development of the CHI methodology itself. Until such time as a superior methodology is developed, the City's considered choice of the CHI methodology is eminently reasonable.

The impressive qualifications of the affiants and the clarity of their reasoning persuade us that they are worthy of credence and that it was reasonable for the City to rely on their opinions. In light of the defendants' experts' detailed responses to Gutman's criticisms of the FEIS and DBMP, Gutman's affidavits do not constitute convincing evidence that the methodologies used in preparing those documents were unreasonable.

## VI.

█ As indicated above, ATURA argues that summary judgment should be granted in its favor because the measures proposed in the FEIS and the DBMP will not attain the NAAQS by December 31, 1987, the date set forth in the SIP. The defendants

---

12. Affidavit of Gail Benjamin in Opposition to Plaintiffs' Motion for a Preliminary Injunction and in Support of Municipal Defendants' Cross-Motion for Summary Judgment ("Benjamin Affidavit") (Jan. 26, 1989) at ¶ 5.

13. *Id.* at ¶ 6.

14. *Id.*

15. ¶ 7.

16. *Id.*

17. Benjamin Affidavit at ¶¶ 12–24.

18. Id at ¶¶ 25–32, 35.

respond that the City's commitment does not require the attainment of the NAAQS by December 31, 1987, but by referring to this date simply restates the goal of the Clean Air Act which existed at the time the SIP became effective, as well as committing the City to assure development and implementation of measures sufficient to achieve and maintain the NAAQS. *See Wilder v. Thomas,* 854 F.2d 605, 615 (2d Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 1314, 103 L.Ed.2d 583 (1989).

Unfortunately, the history of the Clean Air Act is replete with cases throughout the United States in which deadlines set by the Act have passed without attainment of the legal standards which it imposes. Many courts, including this one, faced with violations of these seemingly absolute deadlines have concluded that the only practical response to complaints that standards have not been timely met is to require compliance within a reasonable time. *Council of Commuter Organizations v. Gorsuch,* 683 F.2d 648, 661 (2d Cir.1982); *Natural Resources Defense Council, Inc. v. Train,* 510 F.2d 692, 713 (D.C.Cir.1974); *Natural Resources Defense Council, Inc. v. New York State Department of Environmental Conservation,* 668 F.Supp. 848, 852 (S.D.N.Y.1987); *State v. Gorsuch,* 554 F.Supp. 1060, 1066 (S.D.N.Y.1983).

The FEIS was published in August of 1986, one year and four months before the December 31, 1987 attainment deadline. In 1986, a number of projects which promised to work dramatic changes in traffic patterns in downtown Brooklyn were proposed. The City studied the traffic problem on a large-scale, system-wide basis and published the DBMP in January of 1987, one year before the attainment date. The budget for all of the DBMP measures was not approved by the Board of Estimate until June of 1988, six months after the attainment date. It is difficult to conclude

that Congress intended, or even contemplated, that a public project of this kind would be placed in jeopardy for failure of the City to attain the air quality standards, which would not have been attained without the Project, within one year and four months after the publication of the FEIS which defines the scope of the problem.

Congress, recognizing that failure to attain the air quality standards by the December 31, 1987 deadline is a widespread national problem, is presently considering amendments to the Clean Air Act. All of the pending bills currently in committee would set new attainment deadlines five to twenty years in the future.[19]

The EPA, charged with enforcement of the 1987 deadline, has already issued a *de facto* extension. Faced with the prospect of widespread noncompliance with the deadline, the EPA proposed a "post–1987 policy" in November of 1987.[20] This policy gives states several years to revise inadequate SIPs and then several years after that to fulfill the requirements of the revised SIPS. The EPA has not yet taken final action on the policy.[21]

The Court of Appeals for the Ninth Circuit recently rejected one application of the EPA's "post–1987 policy." *Delaney v. EPA,* 898 F.2d 687 (9th Cir.1990). The *Delaney* court reversed EPA's approval in 1988 of an Arizona SIP that did not provide for attainment of air quality standards until 1991, holding that the Clean Air Act's 1982 and 1987 deadlines are "absolute" and cannot be extended by the EPA. 898 F.2d at 690. However, consistent with the pragmatic approach displayed by other courts, the *Delaney* court declared that once the deadlines have passed, the state must "utilize all available control measures to attain the carbon monoxide ambient air quality standards as soon as possible." 898 F.2d at 690. The court explained that the EPA should have found the Arizona plan invalid

**19.** Baron, *Urban Air Quality Litigation Under the Clean Air Act: Past, Present and Future,* 20 Environmental Law Reporter 10216 (June 1990), citing H.R. 2323, 101st Cong., 1st Sess. (Waxman bill); H.R. 3030, 101 Cong, 1st Sess. (administration bill); S.R. 1630, 101st Cong., 1st Sess. (Baucus bill).

**20.** 52 Fed.Reg. 40544 (1987).

**21.** Baron, *Urban Air Quality Litigation Under the Clean Air Act: Past, Present and Future,* 20 Environmental Law Reporter 10216 (June 1990).

because it failed to incorporate several control measures that the state itself had identified as likely to advance the attainment date. 898 F.2d at 692.

The EPA has informed New York State that its SIP is inadequate and given the state an opportunity to revise its SIP by incorporating the DBMP.[22] Once the revised SIP has been approved by the EPA, ATURA may, after exhausting its administrative remedies, challenge the EPA's approval in the Court of Appeals. *See* 42 U.S.C. § 7607(b); *Council of Commuter Organizations v. Gorsuch*, 683 F.2d 648 (2d Cir.1982); *Friends of the Earth v. Environmental Protection Agency*, 499 F.2d 1118 (2d Cir.1974).

The existence of the December 31, 1987 attainment date does not require injunctive relief, which is a matter of equitable discretion. *Natural Resources Defense Council, Inc. v. Train*, 510 F.2d at 713. In exercising that discretion, the district court must remember the public interest on both sides of the issue.

The FEIS and the DBMP represent a reasonable attempt by the City to achieve the NAAQS as soon as possible. The failure of the City to attain the NAAQS by December 31, 1987 was not the result of any repudiation of its commitment to solve the problem of air pollution, but rather a function of the exigencies of such a vast undertaking.

The facts before us demonstrate that the defendants understand their obligations under the Clean Air Act and are taking all reasonable steps to fulfill them. To halt this Project because of a statutory deadline which has proven to be unattainable would serve no useful purpose.[23]

Accordingly, ATURA's motions for summary judgment and to amend the complaint are denied and the defendants' cross-motion for summary judgment is granted.[24]

The complaint is dismissed.

It is so ordered.

## APPENDIX

ATURA's major criticisms of the FEIS and the DBMP and the defendants responses to those criticisms are outlined below.

A. *The Inspection and Maintenance Program and the Mechanics Training Program*

1. THE ISSUE

As required by the EPA, on January 1, 1982, New York State instituted a vehicle inspection and maintenance program (the "I & M program") to reduce carbon monoxide emissions to meet the NAAQS. New York State also sponsors a mechanics training program designed to teach mechanics how to reduce carbon monoxide emissions from the vehicles they service. The predictions of future carbon monoxide concentrations in the FEIS are based on the assumption that these programs are fully effective.[25]

---

**22.** Benjamin Affidavit, Exhibit H, Letter from Christopher J. Daggett, EPA Regional Administrator to Commissioners Sandler and Schultz, dated June 2, 1987.

**23.** ATURA moves to add an eighth claim which states that the defendants have violated NEPA by "preparing and relying upon an FEIS based upon inaccurate and incorrect assumptions and information resulting in underestimates of the air quality effects of the Project" and by "failing to prepare a supplemental EIS to assess the significant changes since the preparation of the FEIS."

In our decision of February 7, 1989, 705 F.Supp. 988, we deferred ruling on ATURA's motion to amend the complaint to add this claim noting that leave to amend would only be granted if the plaintiffs made a threshold showing that there is sound reason to believe that they may prevail on this claim.

For the reasons explained above, ATURA has not made a threshold showing that there is sound reason to believe that it will prevail on its NEPA claim if such a claim were allowed to be added. Accordingly, leave to amend is denied.

**24.** ATURA's fifth claim alleges that the City was arbitrary and capricious in seeking an Urban Development Action Grant for a project that violates the SIP. In light of our finding that the City is in compliance with the SIP, the fifth claim is dismissed.

**25.** Declaration of Daniel Gutman ("Gutman Declaration") (November 21, 1988) at ¶ 49.

## 2. ATURA'S POSITION

Gutman, ATURA's expert, asserts that the I & M program and the mechanics training program do not currently achieve the air quality benefits that are predicted by the FEIS. He points to an October 15, 1986 audit report from the EPA, issued three days after the ATURA project was approved, indicating that in 1985 the I & M program was achieving only one-third of the emissions reduction that it would achieve if it were fully effective.[26] Gutman contends that if credit were limited to the emissions reduction actually achieved by the I & M program, then carbon monoxide concentrations will be 34% higher than those reported in the EIS.[27]

With regard to the mechanics training program, Gutman points out that the program is voluntary and only a small percentage of the mechanics who repair emissions systems have actually participated in the program.[28] Gutman notes that the EPA has notified New York State that it is not entitled to credit for the mechanics training program because the state has not submitted the necessary documentation to have the program certified by the EPA. Gutman also contends that the program does not qualify for EPA approval because it is not mandatory.[29] In the FEIS predictions for 1991, the mechanics training program accounts for a claimed emission reduction of about 4.7%.[30]

## 3. THE DEFENDANT'S POSITION

The defendants state that full credit for emissions reductions from the I & M program and the mechanics training program has been taken in all environmental impact statements involving air quality analysis done under the supervision of the DEP since 1982 and in the New York SIP.[31] With regard to the I & M program, Benjamin explains that it is the EPA's function to determine the appropriate reduction for the I & M program and that the EPA has stated that use of full credit for the program is appropriate. The City cannot alter those figures without direction from the EPA and the New York Department of Environmental Protection. In the absence of such direction, the City must rely on the standards articulated in the SIP. Neither EPA nor the State has initiated the established process to modify the credits. Rather, the EPA directed the City that the taking of such credits is appropriate.[32]

The defendants argue that it was reasonable and prudent of them as delegatees of federal environmental duties, to follow the methods approved and sanctioned by the EPA. They argue further that since a 1987 report published by the EPA established that the I & M program was improving, it was reasonable for the FEIS to assume that the problems identified in 1985 would be corrected by 1988 to bring the program to the performance levels predicted in the SIP. With regard to the audit, Benjamin explains that the purpose of the audit was to identify problems with state inspection and maintenance programs so as to allow the relevant state agencies to correct the problems,[33] and that the results of the audit were later questioned by the EPA.[34]

The defendants maintain that although the reduction credit taken in the FEIS for the mechanics training program has not explicitly been approved by the EPA, approval is a mere formality. The program is

26. Gutman Declaration at ¶ 50.

27. Gutman Declaration at ¶ 51.

28. Supplemental Declaration of Daniel Gutman in Opposition to Defendants' Motion for Summary Judgment ("Gutman Supplemental Declaration") (March 23, 1988) at ¶ 5.

29. Gutman Declaration at ¶¶ 52–54.

30. Gutman Declaration at ¶ 54.

31. Benjamin Affidavit at ¶ 27.

32. Reply Affidavit of Gail Benjamin ("Benjamin Reply Affidavit") (May 8, 1989) at ¶ 7.

33. *See* Benjamin Reply Affidavit, Exhibit A, EPA Guidelines for Auditing Motor Vehicle Emission Inspection Programs, FY 88–89.

34. Benjamin Affidavit, Exhibit F, Letter from William S. Baker of EPA to Mira Bauer of DEP, dated September 23, 1987.

in place and is achieving emissions reductions.[35] The EPA has not opposed the use of the credit and has in fact approved the air quality analysis in the DBMP in which the credit was used.[36]

### B. *Comparison of Build and No–Build Alternatives*

#### 1. THE ISSUE

The FEIS analyzes future air quality under four possible set of conditions: 1) the Project without mitigation measures, 2) the Project with the mitigation measures outlined in the FEIS, 3) no Project and no mitigation measures, and 4) the mitigation measures outlined in the FEIS without the Project.

#### 2. ATURA'S POSITION

ATURA claims that the FEIS should have also analyzed future air quality assuming that the Project would not be built and both the FEIS mitigation and the DBMP attainment measures would be implemented.

#### 3. THE DEFENDANT'S POSITION

The defendants respond that the DBMP measures are not part of the FEIS Project mitigation and were not even published as of the date of the FEIS. The defendants also explain that while the FEIS only discussed the effectiveness of the DBMP measures in the context of building the Project, the DBMP itself included figures for carbon monoxide levels without the Project and with the DBMP attainment measures.

### C. *Schedule of Implementation of DBMP Measures*

#### 1. THE ISSUE

The FEIS assumes that all elements of the DBMP's attainment measures relevant to the Atlantic Terminal Project will be complete by the opening date of the Project and factors those measures into the impact and mitigation analyses.[37] Based on this assumption, the FEIS states that the Project area will achieve compliance with the NAAQS in 1992.[38]

#### 2. ATURA'S POSITION

ATURA maintains that the results predicted in Table IV–4 of the FEIS are unreliable because, among other reasons, the proposed attainment measures will not be built on time. ATURA alleges that many of the capital improvements which the City committed to carry out as traffic mitigation measures are far behind schedule and will not be completed by 1991.[39]

#### 3. DEFENDANT'S POSITION

The defendants state that completion of all DBMP measures is anticipated by late 1993.[40]

### D. *The CHI Methodology and Imputed V/C Ratios*

#### 1. THE ISSUE

The volume-to-capacity ratio is the ratio of the number of vehicles on a particular street to that street's capacity for vehicles. The analysis of future carbon monoxide concentrations depends upon predictions of how well traffic on a particular road will flow, which in turn depends upon the relationship between the volume-to-capacity ratio and traffic speed. A higher volume-to-capacity ratio indicates a greater degree of traffic congestion and a corresponding lower traffic speed.[41] Traffic traveling at lower speeds causes more carbon monoxide pollution than traffic traveling at higher speeds. The air quality predictions in the Atlantic Terminal Project FEIS and the DBMP are based on a mathematical equa-

---

**35.** Benjamin Reply Affidavit, Exhibit B, *The Hotline,* published by the New York State Department of Motor Vehicles, Winter 1988.

**36.** Benjamin Affidavit, Exhibit C, Letter from Christopher Daggett of EPA to Commissioners Sandler and Schultz, dated March 12, 1987.

**37.** Gutman Declaration at ¶ 17.

**38.** FEIS at Table IV–4.

**39.** Gutman Declaration at ¶¶ 55–57.

**40.** FEIS at IV–27; Sandler Affidavit at ¶ 10.

**41.** Gutman Declaration at ¶¶ 20–21.

tion known as the "CHI equation" that relates the v/c ratio to vehicle speed. For certain locations, this equation has been modified by another mathematical equation known as the "imputed v/c ratio."

## 2. ATURA'S POSITION

Gutman states that the CHI methodology and the imputed v/c ratios caused underpredictions of carbon monoxide concentrations by 30–50%. He claims that the defendants' use of the CHI equation was unreasonable. According to Gutman, the CHI equation has never been validated and the DEP has approved the use only of the congestion delay formula portion of the CHI equation and has required that an EIS use actual measurements of existing vehicle speeds.[42] Gutman states that the CHI equation is not an adequate predictor and violates the minimum criteria for an acceptable equation.[43] According to Gutman, the artificially high volume-to-capacity ratios obtained through use of the CHI modeling method exaggerated the difference between 1993 and 1985 vehicle speeds.[44] These artificially high vehicle speeds for 1993 resulted in artificially low predictions for carbon monoxide concentrations. Gutman states further that the municipal defendants' claim that traffic volumes can exceed capacity is impossible given the definition of capacity and volume.

## 3. DEFENDANTS' POSITION

Benjamin asserts that the use of the imputed v/c methodology was the result of detailed analyses, the application of standard traffic engineering principles, and professional judgments by qualified engineers and experts. As part of the preliminary work for the DBMP, a network of measured speeds for the downtown Brooklyn area was compiled to be used as a basis for calculating future conditions for all downtown Brooklyn projects. A consultant on the Atlantic Terminal EIS then undertook a study to compare the speeds measured with the speeds that would be predicted using four different methodologies. The CHI methodology was chosen because it both provides a conservative estimate of speeds (i.e., tended to show slower future speeds, and thus greater impacts) while closely reproducing actual speeds measured in the field. Accordingly, the City informed the consultants for all downtown Brooklyn environmental impact statements, including the Atlantic Terminal EIS, that they should adjust speeds for future conditions using the CHI methodology.

When it became apparent that in certain heavily congested intersections in downtown Brooklyn the measured speeds did not correlate with the speeds calculated using the CHI methodology, the consultant that prepared the DBMP proposed the imputed v/c ratio. After discussion with the consultants, the reviewers for the City agencies determined, in their professional judgment, that the imputed v/c ratio modification of the CHI methodology was a better indicator of impacts where it was used than the CHI methodology without modifications. After thoroughly reviewing the use of the imputed v/c modification of CHI with the City Department of Environmental Protection ("DEP") and the consultants in several meetings, in a series of telephone calls and in writing, the EPA concurred that the results were reasonable and the use of the methodology was appropriate.[45]

---

**42.** Gutman Supplemental Declaration at ¶¶ 33–36.

**43.** *Id.* at ¶¶ 32, 47–59.

**44.** *Id.* at ¶¶ 25 *et seq.*

**45.** Benjamin Affidavit at ¶¶ 15–18.