**COALITION AGAINST COLUMBUS CENTER, Selma Arnold, Ross Graham, Al Hehn, Columbus Center Travel, Ltd. and Coalition Against Lincoln West, Inc., Plaintiffs,**

v.

**The CITY OF NEW YORK, the Board of Estimate of the City of New York, the Department of Housing Preservation and Development of the City of New York, the Metropolitan Transportation Agency, the Triborough Bridge and Tunnel Authority, the New York City Industrial Development Agency and Coliseum Associates, Defendants.**

No. 90 Civ. 5014 (SWK).

United States District Court, S.D. New York.

July 10, 1991.

members of nearby Community Boards and others are officers of the Tenants' Associations of local buildings.

Defendant Triborough Bridge and Tunnel Authority ("TBTA"), is the seller of the Project site, for itself and on behalf of defendant City of New York ("the City" or "NYC"). Defendant New York City Industrial Development Agency ("NYC IDA") is a public benefit corporation which is participating in the financing of the project. Defendant New York City Board of Estimate approves all dispositions of the City's real estate interests and amendments to its urban renewal plans. Other defendant City agencies are the Department of Housing Preservation and Development ("HPD") and defendant Metropolitan Transit Authority [2] (the parent agency of TBTA). Defendant Boston Properties is the developer, acting through defendant Coliseum Associates.

The City acquired the site just west of Columbus Circle in 1953 by condemnation under the Columbus Circle Slum Clearance Plan, pursuant to General Municipal Law § 72–k then in force. The TBTA purchased rights to use and occupancy in consideration of approximately two million dollars. In 1956 the TBTA constructed, and has since operated an office building and the New York Coliseum, a convention center, on the site. When these facilities were rendered obsolete in the early 1980s by the construction of the Jacob Javits Convention Center, the City and TBTA agreed in 1984 to sell the Coliseum site. The City sought proposals for private purchase and redevelopment of the site pursuant to a study by the City Department of City Planning which recommended overhauling the zoning regulations of the Midtown area to increase the permitted density. City Planning Commission, *Midtown Zoning*, March 1982 (attached as Exhibit 8 to Affidavit of Frederick S. Harris, dated October 5, 1989 (hereinafter "Harris Aff."), annexed to Defendants' Memorandum of Law in Support

Stults Balber Horton & Slotnik by John T. Van Der Tuin and Pesetsky, Goldfeder & Bookman by Jerry H. Goldfeder, New York City, for plaintiffs.

Patterson, Belknap, Webb & Tyler by Robert P. LoBue, Howard Goldman, Steven Russo, New York City, for defendants Metropolitan Transp. Authority and Triborough Bridge and Tunnel Authority.

Victor A. Kovner, Corp. Counsel of City of New York by Daniel Turbow, Rosemary Myers, New York City, for Mun. defendants.

Berger Steingut Tarnoff & Stern by Theodore S. Steingut, Bernard D'Orazio, New York City, for defendant New York City Indus. Development Agency.

Paul Weiss Rifkind Wharton & Garrison by Robert A. Atkins and Brown & Wood by Paul Selver, Elise Wagner, New York City, for defendant Coliseum Associates.

## MEMORANDUM OPINION AND ORDER

KRAM, District Judge.

This case challenges, from a variety of environmental and regulatory standpoints, the proposed building of "Columbus Center" (the "Project"), a 2.1 million square foot mixed-use redevelopment project involving retail, office, cinema, residential and parking garage space near Columbus Circle in Manhattan. Presently before the Court are defendants' joint motion for summary judgment and plaintiffs' cross-motion for partial summary judgment.

## BACKGROUND [1]

Plaintiffs are a group of coalitions, individual neighbors and local businesses which oppose the construction of Columbus Center. Some of the individuals are board

---

**1.** For the purpose of the present motions, all facts alleged in the Complaint will be presumed true, and all contested factual issues will be resolved in favor of the non-moving party.

**2.** Incorrectly sued here as the Metropolitan Transit Agency.

of Motion to Dismiss or for Summary Judgment ("Def. Mem. I")), at 27. The TBTA was designated the "lead agency" to carry out the required environmental studies under the State Environmental Quality Review Act ("SEQRA"), including a draft Environmental Impact Statement ("DEIS") and final Environmental Impact Statement ("FEIS").

After receiving fifteen proposals for development of the site, TBTA accepted Boston Properties' proposal.[3] The agreement among the parties (hereinafter the "New Purchase Agreement") provides, *inter alia*, that NYC IDA will be the owner of the commercial portion of the project, and will issue certain tax exempt bonds to Coliseum Associates for financing. The gross purchase price, *i.e.*, not including the benefit package provided through NYC IDA, is approximately $338 million. The proceeds are to be applied toward capital and operating programs of the City's transit system.

The project has been challenged in several other lawsuits and has been scaled down twice.[4] The revised terms are embodied in the New Purchase Agreement (hereinafter "the Agreement"). Presently, these plaintiffs challenge the project on six grounds, two federal plus four pendent state claims: (1) alleged violations of the Federal Clean Air Act, 42 U.S.C. §§ 7401 *et seq.*; (2) Article 78 proceeding against alleged violations of the New York City Zoning Resolution,

Article 1, Ch. 3 and 6 NYCRR Part 203; (3) alleged violation of NYC IDA Mandate, § 917 of New York State General Municipal Law; (4) alleged violation of NYC IDA internal regulations and policies; (5) alleged conflict of interest in violation of § 73 of State Public Officers Law; and (6) Federal Housing Act and HUD violations.

The relief plaintiffs seek is a declaration that the New Purchase Agreement is null and void and a declaration that the five resolutions of the Board of Estimate, two TBTA resolutions and one NYC IDA resolution approving, enabling, or financing the sale are void. Additionally, as to the Clean Air Act claim, plaintiffs seek an injunction against defendants from taking any steps in furtherance of the project until (1) a revised Environmental Impact Statement is prepared to show how carbon monoxide violations will be avoided; (2) the project is revised to eliminate changes to the parking garage until a special permit is obtained; and (3) a permit for that garage is granted by the New York State Commissioner of DEC. Complaint at 35–38. Plaintiffs also seek costs and attorneys' fees.

This matter was previously dismissed without prejudice for failure to comply with a 60–day waiting period under the Clean Air Act. *See Coalition Against Columbus Center v. City of New York*, 750 F.Supp. 93, 95 (S.D.N.Y.1990) (hereinafter *Columbus Center I*). Familiarity with

---

**3.** Plaintiffs allege intense favoritism in the solicitation and acceptance of Boston Properties' proposal. *See* Pl.Mem. I at 53 (quoting Report of New York State Assembly Standing Committee on Oversight, Analysis and Investigation, dated September 25, 1986 (annexed to Pl.Mem. I as Exh. B at 9) ("It cannot be overstated that the favoritism to Boston Properties was bold and extreme")). However, the competitiveness of the bidding, or lack thereof, has already been litigated, *see Jo & Wo Realty Corp. v. City of New York*, 140 Misc.2d 154, 530 N.Y.S.2d 479 (Sup. Ct.N.Y.Co.1988), *aff'd* 157 A.D.2d 205, 555 N.Y.S.2d 271 (1st Dept), *aff'd* 76 N.Y.2d 962, 563 N.Y.S.2d 727, 565 N.E.2d 476 (1990), and is not directly challenged in this lawsuit.

**4.** In two separate proceedings in the New York Supreme Court, the court held unlawful a provision of the contract which provided for an additional $57 million payment to the City if the developer succeeded in obtaining City Planning

Commission approval for a maximum floor area bonus in exchange for subway improvements. *Municipal Art Society of New York v. City of New York*, 137 Misc.2d 832, 522 N.Y.S.2d 800 (N.Y.Co.1987). In another action, taxpayers challenged the statute allowing the sale of the land to other than the highest bidder and agreement to share proceeds of sale of land with transit authority. *Jo & Wo Realty Corp.*, 530 N.Y.S.2d at 480. That case was dismissed on defendants' summary judgment motion. *Id.*

The sale price of the original project, approved by the TBTA and Board of Estimate in February 1987, was $453 million. The deal was restructured when co-venturer Salomon Brothers withdrew after the 1987 stock market crash. It was at this point that NYC IDA became involved in the Project. The proposed structure was downsized from approximately 2.7 million square feet. The TBTA and the Board of Estimate approved the redesigned proposal in May 1989.

that opinion is assumed. The waiting period has run and plaintiffs have now refiled. Cross-motions for summary judgment were pending before the Court at the time the Court dismissed the prior action. Since refiling, the parties have submitted supplemental briefs, affidavits and exhibits in support of their motions. The Court heard Oral Argument on May 15, 1991 and ordered additional information to be provided to it on June 24, 1991.

There has been little if any discovery in this case. However, the parties agree that there are no contested factual issues as to the first three causes of action, and that at least these can be resolved on summary judgment motions alone.

## DISCUSSION

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c). In testing whether the movant has met this burden, the Court must resolve all ambiguities against the movant. *Lopez v. S.B. Thomas, Inc.,* 831 F.2d 1184, 1187 (2d Cir.1987) (citing *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Adickes v. S.H. Kress and Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). The movant may discharge this burden by demonstrating to the Court that there is an absence of evidence to support the non-moving party's case on which that party would have the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).[5] The non-moving party then has

the burden of coming forward with "specific facts showing that there is a genuine issue for trial." Rule 56(e). The non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Speculation, conclusory allegations and mere denials are not enough to raise genuine issues of fact. To avoid summary judgment, enough evidence must favor the non-moving party's case such that a jury could return a verdict in its favor. *See Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (interpreting the "genuineness" requirement).

### I. Federal Clean Air Act Claim.

■ The Clean Air Act ("CAA") is comprehensive federal environmental law that calls upon the United States Environmental Protection Agency (hereinafter "EPA") to promulgate national ambient air quality standards ("NAAQS") for various pollutants. *See* 42 U.S.C. §§ 7409 *et seq.* The individual states determine how to achieve and maintain these standards by devising a State Implementation Plan ("SIP"). *Id.* at § 7410. The EPA enforces compliance, but the CAA also authorizes citizen suits under certain circumstances. *Id.* § 7604. In order for citizens properly to allege a CAA violation, they must allege that the City has specifically "repudiated" or "failed to fulfill" any part of its SIP commitment. *Wilder v. Thomas,* 659 F.Supp. 1500, 1507 (S.D.N.Y.1987), *aff'd,* 854 F.2d 605, 610 (2d Cir.1988).

In this citizen suit, plaintiffs allege violation of the Clean Air Act ("CAA") by repudiation or failure to fulfill three different undertakings in the New York State SIP.

---

**5.** The moving party may rely on the evidence in the record to point out the absence of genuine issues of material fact. *Celotex, supra,* 477 U.S. at 323, 106 S.Ct. at 2552–53. The moving party does not have the burden of providing evidence to negate the non-moving party's claims. *Id.* As the Supreme Court recently noted, "whether the moving party accompanies its summary judgment motion with affidavits, the motion may, and should, be granted so long as whatever is before the court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.*

A. *The City's Commitment to Mitigate Violations and Exacerbations of the Carbon Monoxide Standard*

1. Presence of Violations, Exceedences or Exacerbations

The portion of the current New York State SIP, dated January 1984, that relates to control of carbon monoxide and hydrocarbons in New York City, provides, in relevant part:

To further ensure that the carbon monoxide standard is attained in New York City, if an EIS for a project proposal identifies a violation or exacerbation of the carbon monoxide standard, then the City commits to assure that mitigating measures will be implemented by the project sponsor or City, so as to provide for attainment of the standard by December 31, 1987 and maintenance of it thereafter.

New York State Air Quality Implementation Plan, § 3.6(A) (attached to Harris Aff. as Exhibit 15).[6]

The carbon monoxide standard relevant to the present case is the requirement that the concentration of carbon monoxide in the air shall not exceed a level of 9 parts per million (ppm) over an 8–hour period more than once a year. Complaint ¶ 82. According to the Final EIS prepared for this Project, of ten test sites near the Project, the maximum level of 9 ppm will be exceeded at one site and reached but not exceeded at two other sites.[7] *Id.* ¶ 83; FEIS Table II.H–7 (attached as Exhibit 16 to Harris Aff.). At the test site where the standard will be exceeded, the East 59th Street site, the carbon monoxide level would reach 13.3 ppm if the Project were built, but will reach 12.9 ppm even without it. FEIS Table II.H–7. The Complaint charges that required mitigation measures are omitted at these three sites, in violation of the SIP. Complaint ¶ 87(a).

Although it is true that the carbon monoxide level at many surrounding test sites will be increased as a result of the building of Columbus Center, defendants correctly point out, and plaintiffs appear to have conceded,[8] that the two sites at which 9 ppm has been reached but not exceeded cannot be considered a NAAQS violation under prevailing regulations. *See* 40 C.F.R. § 50.8(a)(1) (9 ppm eight hour level "not to be exceeded").

As to the East 59th Street test site, which the FEIS predicts will exceed air quality standards both with and without the Project, there is some dispute about whether Project has a legally cognizable impact on the eight-hour carbon monoxide concentration. The carbon monoxide concentration is calculated to one decimal place and EPA regulations call for comparisons to be made "in terms of integers with fractional parts of 0.5 or greater rounding up." 40 C.F.R. § 50.8(d). Performing the prescribed rounding for comparison purposes, the "without the project" figure of 12.9 ppm rounds up to 13 ppm, and the "with the project" figure of 13.3 ppm rounds down to 13 ppm. Under the rounding procedure authorized by 40 C.F.R. § 50.8(d), then, the carbon monoxide level at the East 59th Street site is 13 ppm in either case. The Court must conclude that under this method of calculation the Project has no legally cognizable effect on carbon monoxide emissions at that site.

Defendants point out that the same result would obtain under the State Environmental Quality Review Act ("SEQRA"), which allows for a fluctuation of plus-or-minus .5 ppm before the project is deemed to be out of compliance (the *"de minimis* rule"). Department of Environmental Conservation Air Guide No. 23—Indirect Sources of Air Contamination (Guidelines for Addressing Indirect Sources), dated

---

**6.** The Court sets aside for the moment the question of the significance of the December 31, 1987 attainment deadline.

**7.** Plaintiffs do not adopt the predictions made in the FEIS, but instead charge that the FEIS "substantially underpredict[s]" both the likely increased trafic volume and the likely increased carbon monoxide concentrations. Complaint ¶ 83.

**8.** *See* Plaintiffs' Memorandum in Opposition to Defendants' *Motion to Dismiss and in Support* of their Motion for Partial Summary Judgment (hereinafter "Pl.Mem. I"), at 25 n. 8.

June 8, 1989 (attached to Harris Aff. as Exh. 17), at 6; *see also* Department of Environmental Conservation Policy Memorandum 78–AIR–30, dated October 5, 1978 (attached to Harris Aff. as Exh. 18). Under SEQRA's *de minimis* rule, a .4 ppm difference in the carbon monoxide level with and without the Project, such as that found at the East 59th Street test site, would not be legally cognizable. Plaintiffs challenge this *de minimis* approach (Complaint ¶¶ 84, 87(a)).

The Court acknowledges plaintiffs' concern about the *de minimis* allowance in that the level of carbon monoxide at the test sites may creep up by increments of .4 ppm or less, without any particular project having to accept responsibility as a direct cause of the problem. On the other hand, *de minimis* rules have been upheld in several contexts because they provide a way of correcting for the inherent limitations of measuring instruments and predictive models. *See, e.g., Connecticut Fund for the Environment, Inc. v. EPA*, 696 F.2d 147, 163–65 (2d Cir.1982) and 696 F.2d 169, 177 (2d Cir.1982); *California Air Resources Board v. EPA*, 774 F.2d 1437, 1443 (9th Cir.1985); *Air Pollution Control Dist. v. EPA*, 739 F.2d 1071, 1092 (6th Cir.1984); *Alabama Power Co. v. Costle*, 636 F.2d 323, 360 (D.C.Cir.1979).

### 2. Fulfillment of Commitment to Combat Exceedences

Plaintiffs' strongest argument in favor of their claim to enjoin the Project under the CAA is that the EPA requires that new projects must mitigate existing carbon monoxide violations, even those carbon monoxide violations not of the project's own making. U.S. EPA Notice of Proposed Disapproval of the State of New York's Revised SIP, dated September 12, 1988 (at-tached as Exh. F to Pl.Mem. I) ("the SIP commitment does not make [a] distinction between project-caused and nonproject caused CO violations"). The appropriate remedy for a failure of this Project to provide for the mitigation of existing carbon monoxide violations, according to plaintiffs, is halting the Project. Pl.Mem. I at 26–27 & n. 9; *see* 42 U.S.C. § 7604(a) (Court may issue orders enforcing emission standards under the Act).

Defendants acknowledge that § 3.6(A) of the SIP "requires [the City] to commit to assure that attainment measures will be implemented not only for exceedences caused by the Project but also for exceedences not caused by the Project which are revealed through the EIS process." Def. Mem. III at 4. However, they contend that the existence of a City area-wide control program is sufficient to demonstrate the City's continuing commitment under the SIP to assure the implementation of mitigation measures for NAAQS violations disclosed in the project EIS. The Court will therefore direct its inquiry into the City's general efforts to combat exceedences not caused by the Project which are revealed through the EIS process. *See Atlantic Terminal Urban Renewal Area Coalition v. New York City Dept. of Environmental Protection* (hereinafter *"ATURA"*), 740 F.Supp. 989, 991 (S.D.N.Y.1990).

In discussing the Project's conformance with this commitment, the Coliseum EIS relies entirely upon a city-wide carbon monoxide control study sponsored by the City Department of Transportation, entitled Relief of Traffic Congestion and Air Pollution (hereinafter "ROTCAP") (also known as the Traffic Congestion and Pollution Relief Study, or "Traffic CPR").[9] FEIS at II.H–

---

**9.** The Final EIS states with respect to conformance with the City's Air Quality Implementation Plan:

As part of the New York State Air Quality Implementation Plan for Control of Carbon Monoxide and Hydrocarbons in the New York City Metropolitan Area (SIP), as amended in December 1987, the City and State agreed to implement measures necessary "to ensure that carbon monoxide standards will be attained by August 31, 1988 and main-tained thereafter." The standards were not attained by the August 31, 1988 deadline. Congress is currently considering a deferral of that deadline, but no such deferral has yet occurred. In addition, USEPA has determined that the SIPs of a number of states, including New York, have not been adequate to achieve compliance with National Ambient Air Quality Standards for carbon monoxide and ozone and has ruled that each of these states is required to prepare a new SIP. As

**486**

18. This study, ongoing since 1988, is part of the City's area-wide program to address carbon monoxide problem areas, or "hot-spots".[10] Thus the Court must assess whether the FEIS, and the Traffic CPR Study it cites, represent a "reasonable attempt by the City to achieve the NAAQS as soon as possible," *ATURA*, 740 F.Supp. at 998, or whether instead the FEIS and Traffic CPR are so deficient in this respect as to constitute a repudiation or failure to fulfill the SIP commitment. *Wilder*, 659 F.Supp. at 1507.

### a. Operative Date for Attaining NAAQS

Before resolving the issue of whether the Traffic CPR study cited in the Final EIS satisfies New York's SIP commitment to meet NAAQS for carbon monoxide, the Court must first resolve the question it reserved *ante*, n. 7, of the date by which NAAQS must be attained in light of the 1990 CAA amendments. The State's 1984 SIP committed to implement measures to attain NAAQS by December 1987 and maintain it thereafter. In December 1987, the City and State, not in compliance, agreed to implement measures necessary to ensure that carbon monoxide standards would be attained by August 31, 1988 and maintained thereafter. They failed to make this deadline as well.

In 1990 this Court found, in another CAA lawsuit challenging a different building project in New York City, that the December 1987 NAAQS attainment date has given way to a *de facto* extension by the EPA. *ATURA*, 740 F.Supp. at 997. In light of

legislation then pending in Congress which would have the effect of extending the deadline for NAAQS compliance, the *ATURA* Court found in an exercise of its equitable discretion that the City's failure to meet the December 31, 1987 attainment date did not require injunctive relief against the building of the project challenged in that lawsuit. *Id.* at 997–98.

As anticipated, Congress then amended the CAA (the "1990 Amendments") to give New York City until 1995 to achieve NAAQS compliance or, if it fails to meet that target date, an extension under certain conditions until the year 2000.[11] *See* 42 U.S.C. § 7407(d). The EPA has set a deadline of November 15, 1992 for New York State to submit its revised SIP. Pursuant to the 1990 Amendments, when the State does submit its proposed revised SIP, the EPA will then have 6 months to review the proposal and either approve it or disapprove it and send it back to the State for revisions. 42 U.S.C. § 7410(k).

In this factual setting the Court must now determine the operative date for the City's compliance with its SIP obligations. Defendants argue that plaintiffs' claims under the CAA are, for all practical purposes, mooted by the 1990 amendments, and that effective immediately until 1995, the City cannot be deemed out of compliance. Plaintiffs respond that the new deadlines do not take effect until a new SIP is actually approved by the EPA, and that the City is presently still bound by the old date of December 1987.

This Court has already found that the City failed in its 1984 SIP commitment to

---

noted in the section above, the air quality analysis identified only one site with a violation of the eight-hour carbon monoxide standard of 9 ppm. However, the project does not significantly increase the carbon monoxide concentration at this location. The City has instituted a study entitled *Relief of Traffic Congestion and Air Pollution,* designed to address such "hot spots" in a comprehensive manner and achieve SIP compliance on an area-wide basis.
Columbus Center FEIS, attached as Exhibit 16 to Harris Aff., at II.H–18.

10. A "hotspot," as defined in the New York State Air Quality Implementation Plan for Control of

Carbon Monoxide and Hydrocarbons in New York City Metropolitan Area § 3.3, is "any location which has been shown to have a potential to violate the NAAQS for carbon monoxide as of December, 1982." *Wilder,* 854 F.2d at 609–10.

11. Areas which have been classified as "moderate" for carbon monoxide pollution have until December 31, 1995 to reach attainment for carbon monoxide. If they fail to reach that standard by that date, they will be reclassified as "severe" and will have five more years to reach compliance. 42 U.S.C. § 7512. New York City is classified as a "moderate" area.

comply with NAAQS by 1987. *See ATU-RA*, 740 F.Supp. at 998. Nothing in the CAA or its legislative history indicates that Congress intended to excuse non-complying regions from their Clean Air Obligations during the process of assembly, submission, and approval of revised SIPs. To the contrary, the "Savings Clauses" of the relevant portion of the 1990 Amendments specifically provide:

> (1) Existing plan provisions. Any provision of any applicable implementation plan that was approved or promulgated by the Administrator pursuant to this section as in effect before the date of the enactment of the Clean Air Act Amendments of 1990 [enacted Nov. 15, 1990] shall remain in effect as part of such applicable implementation plan, except to the extent that a revision to such provision is approved or promulgated by the Administrator pursuant to this Act.

42 U.S.C. § 7410(n). Moreover, as a general policy matter, Congress' express concern when it first adopted the present statutory structure was to accelerate the previously slow pace of air quality improvements. *See* House Report 1146, *reprinted in* 1970 U.S.Cong. & Ad.News 5356, 5356 (cited in *State v. Gorsuch*, 554 F.Supp. 1060, 1063 (S.D.N.Y.1983)).

New York's revised SIP is not due until sixteen months hence. Defendants are not entitled to a presumption that the State will meet that deadline because the State has missed each of its previous deadlines for submitting earlier versions of its SIP. Under the 1970 CAA amendments New York was to submit its initial SIP by January 31, 1972. 42 U.S.C. §§ 7401 *et seq.* (1970). New York City did not submit the Transportation Controls portion of its SIP until April, 1973. Van Der Tuin Aff. at ¶¶ 9–10. The 1977 CAA amendments required submission of revised SIPs for non-attainment areas such as New York by January 1, 1979, with an extension under certain conditions until July 1, 1982. The New York City carbon monoxide SIP was not submitted until January 1984. *Id.* at ¶¶ 12–13.

In light of the record in this case, the express provisions of the 1990 Amendments and Congress' general policy considerations in enacting the present statutory scheme, the Court will deem the existing SIP commitments to remain in effect until the revised SIP is approved.

#### b. *Efficacy of City Implementation Measures*

As the City has already missed the December 1987 deadline contained in § 3.6(A) of the SIP, the Court's inquiry is whether the key features of the Traffic CPR Program, cited in the Project FEIS, are reasonably calculated to lead to NAAQS compliance "as soon as possible." *ATURA*, 740 F.Supp. at 998.

The City considers the Traffic CPR program, undertaken at a projected cost to the City of $2.75 million, to be the "centerpiece" of its "commitment to attain and maintain air quality standards." Affidavit of Mira Barer, Deputy Commissioner of the New York City Department of Environmental Protection (hereinafter "Barer Aff.") at ¶¶ 8–9. Deputy Commissioner Barer indicates that the Traffic CPR is "intended to comply with the mandates of the Clean Air Act." Barer Aff. ¶ 9. Control measures flowing from it will serve as the blueprint for the new New York SIP that must be submitted to the EPA for approval. Barer Aff. at ¶ 9; Exhibit A attached to Barer Aff. at 8 & Table 1. The study was begun in 1988 as an outgrowth of a 1986 report by then-New York City Transportation Commissioner Ross Sandler, proposing strategies for addressing the carbon monoxide problem. Van der Tuin Aff. ¶ 16. Deputy Commissioner Primeggia anticipates that the study will be complete in time for the November 15, 1992 deadline for submission of revised SIP. Affidavit of Michael Primeggia, Deputy Commissioner of New York City Department of Transportation, dated December 6, 1990 (hereinafter "Primeggia Aff."), ¶¶ 4, 9; Supplemental Affidavit of Deputy Commissioner Michael Primeggia, dated June 28, 1991 (hereinafter "Primeggia Supp. Aff.") ¶¶ 16, 21.

The Traffic CPR targets several of the "hard core hotspots," including the East

59th Street test site identified in the Project FEIS, for carbon monoxide reduction measures. *Id.* According to Deputy Commissioner Barer and Deputy Commissioner Primeggia, the Traffic CPR program approaches the carbon monoxide problem from an "area-wide" perspective, in part because the usefulness of site-specific measures has been largely exhausted and in part because the City seeks to eliminate the problem rather than merely displace it. Barer Aff. ¶ 8; Primeggia Aff. ¶ 8.

Part A of the Traffic CPR Study is the data collection phase, while Part B is the presentation of "specific pollution and congestion control measures." Primeggia Aff. ¶ 12. Deputy Commissioner Primeggia testified by affidavit that Part A was complete as of June 1990. *Id.* at ¶ 13. The computer program, dubbed "TRANPLAN," which is to analyze this volume of raw data, is not yet complete. Primeggia Supp. Aff. ¶ 15.

Part B of the study is underway, according to Deputy Commissioner Primeggia. Primeggia Aff. ¶ 15. According to him, the measures that will be proposed there fall into two categories: emission control measures and traffic control measures. *Id.* at ¶ 12. The former will incorporate measures going to the redesign and maintenance of automotive tail pipes, many of which measures are being developed on a nationwide basis pursuant to Congressional mandate under the 1990 CAA amendments; these are to be phased in over the next decade. *Id.* at 15; Primeggia Supp.Aff. ¶ 17. The traffic control measures being considered include restricted vehicle entry into Manhattan, use of high-occupancy vehicle lanes, no-car zones, stricter regulation of livery vehicles, refiguring of truck routes, and monetary incentives and penalties. Primeggia Aff. ¶ 16.

Plaintiffs denigrate the Traffic CPR program as "just another phase of a long and expensive study." Van Der Tuin Aff. ¶¶ 15, 20. They point out that Part A of the study is already two years behind the schedule set forth in the study's Request for Proposals. *Id.* ¶ 18. The program itself does not even purport to be an implementation plan, plaintiffs emphasize, but merely a study. On the basis of a study alone, plaintiffs argue, the City should not be considered to have satisfied the SIP commitment to "assure that mitigating measures will be *implemented*" (SIP § 3.6(A)) (cited in Pl.Mem. II at 16) (emphasis added). Plaintiffs assert that the Traffic CPR "may or may not find that mitigation is possible," and that "any alteration to the project to contribute to mitigation may," by the time the study is completed, "be either impossible or much more expensive." Pl.Mem. II at 16.

The Court concludes from reviewing the record that the City is far from implementing any guidelines for the attainment of air quality standards. There is no evidence to support defendants' contention that the City will meet its November 1992 deadline for submission of the revised SIP and the December 1995 deadline for attainment of carbon monoxide NAAQS. The uncontested evidence is to the contrary. The Traffic CPR Study is already two years behind schedule. The City is unable to provide to the Court a summary it requested of the data collected thus far, because the computer program to analyze and interpret the data has not yet been completed. Primeggia Supp.Aff. ¶ 15. Primeggia did not estimate when he anticipates that program will be complete. As to Part B of the study, defendants do not provide any documents, such as draft proposals, to indicate how much progress has been made. Deputy Commissioner Primeggia indicates that the persons responsible for making the proposals are waiting, in part, for the EPA to issue guidance documents in November 1991 which will aid in the preparation of the revised SIPS. Primeggia Supp.Aff. ¶ 19; *see* 42 U.S.C. § 7412($l$)(2). Primeggia testifies that by late spring 1992, "the City plans to assess the most appropriate measures and implementation dates for specific measures...." *Id.* ¶ 20. However, he gives no indication that that time frame is realistic.

The Court appreciates that there are many complex considerations that enter into the mitigation of carbon monoxide pollution in a densely populated city. How-

ever, in light of defendants' inability to supply the Court with any basis for a realistic timetable for development, proposal, adoption and implementation of ameliorative measures, Primeggia's assurances that the City will meet its deadlines for November 1992 and December 1995 ring hollow. *See* Primeggia Supp.Aff. ¶¶ 16, 21; *cf. ATURA*, 740 F.Supp. at 995 (noting the City's and project sponsors' "frank acknowledgement" in the project EIS and area traffic management plan of the seriousness of the air pollution situation). The City officials' intentions, or indeed the amount of money they have allocated to the problem, unfortunately do not necessarily bear any relation to the likely success of this program. By all indications, the City is well on its way to missing the November 15, 1992 deadline, as it has missed each of the others set for it by Congress. The later the proposed SIP is submitted, the later ameliorative measures will be implemented and the less likely that the City will meet the NAAQS by 1995.

In comparison to the mitigation program that was upheld in the *ATURA* case, the Traffic CPR program invoked in this Project's Final EIS does little to evince even minimal commitment to SIP compliance. In *ATURA*, the municipal defendants relied on an existing, comprehensive traffic management plan for the downtown Brooklyn area (the "Downtown Brooklyn Master Plan" or "DBMP") for evidence that it would attain NAAQS for non-Project-caused exceedences in relatively short order. 740 F.Supp. at 991–92. The DBMP contained engineering and street improvement measures, funding for which had already been approved as a part of the City's capital budget plan by the time *ATURA* was decided.[12] *Id.* By contrast, in the present case no ameliorative measures have been implemented, funded, approved, or even proposed. A critical computer program needed to analyze and interpret the raw data has yet to be completed.

The Court finds that the City has "failed to fulfill" § 3.6(A) of its SIP commitment,

*Wilder*, 659 F.Supp. at 1507, because its reliance on the Traffic CPR program cited in this Project's final EIS for mitigation of the carbon monoxide exceedence identified therein does not represent a reasonable attempt to attain air quality standards at any time in the near future. *Cf. ATURA*, 740 F.Supp. at 998 ("the FEIS and the DBMP represent a reasonable attempt by the City to achieve the NAAQS as soon as possible"). Plaintiffs are accordingly entitled to judgment as a matter of law that through this Project the City has violated its continuing obligations under the CAA.

### 3. Remedial Orders

Having found that the Project violates the statutory scheme, the Court now faces the difficult question of an appropriate remedy. *See Friends of the Earth v. Carey*, 535 F.2d 165, 173 (2d Cir.1976) (district court obligated to issue appropriate orders for enforcement of violations of state implementation plan). Once a Court has found a failure of a SIP commitment, enforcement orders are "mandatory." *Natural Resources Defense Council v. New York State Department of Environmental Conservation*, 668 F.Supp. 848, 852 (S.D.N.Y.1987).

Plaintiffs ask this Court to enjoin the Project until a revised FEIS is prepared which shows how the NAAQS violation identified therein will be avoided and compliance achieved and maintained. Complaint at p. 35–36(i). The Court can see some merit in this approach. The City has missed every deadline for NAAQS compliance that Congress has set. For example, the 1970 CAA required that NAAQS be attained within five years of approval of a SIP, including a two-year extension permitted by statute. 42 U.S.C. § 7410(a)(2)(A)(i) and 7410(e)(1). New York City, along with other states and regions, missed both of these deadlines. Affidavit of John T. Van Der Tuin, Esq., dated July 3, 1991, ¶ 11. In 1977, Congress passed amendments to the CAA revising the NAAQS attainment dead-

---

12. The Court notes that it took eighteen months after the DBMP was completed for the City's Board of Estimate to approve the budget for implementing the DBMP measures. *ATURA*, 740 F.Supp. at 997.

line to 1982, with an extension to 1987 under certain conditions. *Id.* at ¶ 12. New York City missed the 1982 deadline, met the criteria for extension, and then missed the extended 1987 deadline as well. *Id.* ¶ 13. The City received a further extension until 1988 and missed it. Now, the 1990 Amendments extend the 1987 deadline until 1995 or 2000. 42 U.S.C. §§ 7407(d), 7512.

Because the City has persistently failed to meet its obligations under the CAA, there is a considerable appeal to plaintiffs' request to enjoin this Project until measures for effectively achieving SIP compliance are implemented. However, the Court questions whether that course is appropriate in light of Congress' recent decision to extend the NAAQS attainment dates to 1995 and beyond. Although the Court may hold, as it does today, that the City is in violation of its commitment to comply with federal air quality standards as currently constituted, issuing injunctive orders in disregard of the new deadlines would not be consistent with Congress' intent in enacting the 1990 Amendments. It is not this Court's function to evaluate the wisdom of Congress' considered judgment in granting these extensions. *See, e.g., State v. Gorsuch,* 554 F.Supp. at 1063.

Balancing the public interests on both sides, this Court, as in *ATURA,* concludes that it would not serve the ends of justice to halt this Project at the present time because of the City's failure to meet the December 1987 deadline. 740 F.Supp. at 998. Congress has deemed that deadline unattainable and the deadline will be postponed for four years upon the EPA's approval of the revised SIP. *Id.* (citing *Natural Resources Defense Counsel, Inc. v. Train,* 510 F.2d 692 (D.C.Cir.1975)). In the meantime, the City is depending on the income from this Project to put towards subway improvement and other public programs. The public's interest in funding these other City undertakings must be considered as well.

Nonetheless the Court will not permit the City to persevere, undeterred, in its violation of these Congressionally-mandated and agency-implemented deadlines. The Court will order injunctive measures to deter future failures of SIP commitments and violations of the CAA, and to assure that the City meets its obligations as contemplated in the 1990 Amendments.

 In exercising its equity powers the Court will mold an injunction decree to the necessities of this particular case. *State v. Gorsuch,* 554 F.Supp. at 1062. The purpose of an injunction is to deter, not to punish. *Id.* (citing *Hecht Co. v. Bowles,* 321 U.S. 321, 329, 64 S.Ct. 587, 591–92, 88 L.Ed. 754 (1944)). It is this Court's role to enforce Congress' will as formulated in legislation. *State of New York v. Gorsuch,* 554 F.Supp. at 1062–63 (citing *TVA v. Hill,* 437 U.S. 153, 194, 98 S.Ct. 2279, 2301–02, 57 L.Ed.2d 117 (1978)). Among Congress' clearly expressed preferences in enacting the Clean Air Act are "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population," and "to encourage and assist the development and operation of regional air pollution prevention and control programs." 42 U.S.C. § 7401(b)(1), (4).

In order to assure future compliance with federally-mandated deadlines and speedy rectification of the carbon monoxide problem, the Court will enter an order enjoining the City of New York from further violating its SIP commitment, as newly constituted by the 1990 Amendments, with respect to mitigation of the carbon monoxide hotspot identified in this Project's Final EIS. If the City fails to complete the Traffic CPR Study in time to incorporate its recommended ameliorative measures into the revised SIP on November 15, 1992, the Court will enter an order enjoining any further work on the Project. Moreover, if that deadline is not met the Court will impose a fine upon defendants, jointly and severally, in the amount of at least $15,-000,000.00 (fifteen million dollars); the initial amount will be followed by additional fines until such time as the City and the Project sponsors fully comply with their statutory obligations.

The purpose of these measures is to deter future noncompliance with the CAA. This remedy is designed to take into account the competing public interests of compliance with the CAA and accomplishment of the City's fiscal objectives in getting this Project underway. Because injunctive relief is an "extraordinary and drastic remedy," *Hecco Ventures v. Avalon Energy Corp.*, 606 F.Supp. 512 (S.D.N.Y.1985), the Court seeks to impose the least onerous sanction reasonably calculated to insure defendants' future compliance with the Clean Air Act. So long as the City meets the new deadlines imposed upon it by the 1990 Amendments, as defendants assure the Court it will, this remedy need not be a painful one.

B. *The State's Commitment to Limit State–Owned Off–Street Midtown Parking Facilities*

■ Plaintiffs further allege that defendants have failed to obtain two permits regulating off-street parking in New York City, and that that failure violates certain SIP commitments, and thus the Clean Air Act.

The State undertook in the SIP:

In order to ensure that the carbon monoxide standard will be obtained by December 31, 1987, and maintained thereafter, [New York State Department of Environmental Conservation] will not issue permits for proposed projects including indirect sources for which the EIS identifies that the project will cause a violation or exacerbation of the standard, unless the State or local government requires that the necessary steps will be taken to prevent the identified violations.

N.Y. SIP, § 3.6. The State Department of Environmental Conservation ("State DEC") promulgated a corresponding regulation requiring that a permit be obtained before a federal- or state-owned parking garage can be constructed or modified. 6 NYCRR Part 203.

It is undisputed that defendants have not applied for or received a Part 203 permit for the garage portion of the Project.

Plaintiffs argue that NYC IDA's involvement in the Project necessitates obtaining such a permit. According to them, defendants' failure to obtain one violates not only Part 203 but also SIP § 3.6, thus creating a claim under the CAA as well as New York's C.P.L.R. Article 78.

Plaintiffs believe that this regulation applies to the instant Project because NYC IDA is a public benefit corporation, which is defined as a "civil division of the state." Pl.Mem. I at 29 (citing *Collins v. Manhattan & Bronx Surface Transit Operating Authority*, 116 Misc.2d 6, 453 N.Y.S.2d 289, 292–293 (S.Ct.N.Y.Co.1981) *and* 1976 Op.Atty.Gen. 294 (local IDA subject to provisions of SEQRA)). Defendants deny that NYC IDA is a state agency. They point out that the *Collins* holding upon which plaintiffs rely was reversed by the Court of Appeals, 62 N.Y.2d 361, 369, 477 N.Y.S.2d 91, 94, 465 N.E.2d 811, 814 (1984). They also rely on the silence of the DEC, the permit-issuing agency, when that agency reviewed the Project EIS and did not require a Part 203 permit application.

The Court assumes without deciding, for purposes of this motion, that NYC IDA is subject to the requirements of 6 NYCRR Part 203. The agency which would consider the application for the permit, the DEC, is the same agency which reviewed and approved the Project in the context of the EIS. The agreements governing the conveyance of the Coliseum site provide that the entire Project, including the Garage, be in full compliance with the City zoning laws. Harris Aff., Exh. 3 at 32. In light of DEC's ultimate approval of the Project, defendants' failure to obtain DEC's express permission is without legal or practical significance. Plaintiffs cannot allege that defendants have repudiated or failed in a SIP commitment or violated state law in this respect, and plaintiffs have consequently failed to state a claim under the Clean Air Act with respect to the Part 203 permit.

C. *Alleged failure to obtain permit for enlargement/replacement of the Project's parking garage*

■ Plaintiffs' other contention with respect to the parking garage is that defen-

dants failed to obtain a permit required for enlargement or expansion. Complaint ¶¶ 86(b) and 87(b). City Zoning laws require that developers apply to the Zoning Board for "enlargements, extension or increase in the number of off-street parking spaces." Art. 1, Ch. 3 of the Zoning Resolution of the City of New York ("Zoning Resolution" or "ZR"). This transportation control measure was adopted by the City pursuant to the SIP to achieve compliance with the carbon monoxide NAAQS. According to plaintiffs, defendants' failure to obtain this permit violates a transportation control measure and thus amounts to a failure of a SIP commitment and a CAA violation.

In response, defendants have supplied plans showing that the contemplated garage reduces, not enlarges, the garage space presently available on the Coliseum site: the same 640 spaces would take up 224,778 square feet instead of the present 277,175. Columbus Center Floorplans, attached as Exhs. 24 and 25 to Harris Aff.

Plaintiffs now concede that the garage is not being enlarged. Pl.Mem. I at 31 n. 12. They instead allege that the garage will change to such an extent that the previously permitted non-conforming use will terminate and that defendants should have applied for a new permit. In support of this new argument, they submit the affidavit of an architect who testifies that in order to accomplish the contemplated changes, ceiling and floor slabs and other critical parts of the garage will have to be demolished or largely demolished. Affidavit of Michael Wurmfeld, AIA, dated October 25, 1989 (hereinafter "Wurmfeld Aff.") at ¶ 5–7; Pl. Mem. II at 20–21. They also point out that the use of the garage will have to be discontinued for a number of months, that ownership will change, and the garage will change over from self-park to valet park. Wurmfeld Aff. at ¶ 8; Pl.Mem. I at 32. They thus argue that the existing garage, which has been approved as a permitted non-conforming use, ZR 13–012(a), will be destroyed or changed to such an extent that it is no longer the same garage, and thus should no longer qualify as a pre-existing non-conforming use. ZR § 52–531.

Defendants argue that this Court is the wrong forum for plaintiffs to raise this new theory. They state that plaintiffs should have gone to the Board of Standards and Appeals within 30 days after they received actual notice of the Deputy Commissioner's permission to continue the 640 spaces as non-conforming use, in November of 1989. Since they did not exhaust their administrative remedies, they are barred from raising this objection here. *See* Def.Mem. IV at 3–4 (citing *Action for Rational Transit v. West Side Highway Project*, 699 F.2d 614, 616–617 (2d Cir. 1983)). Moreover, they argue, it would be in the public's interest for the Court to abstain from granting the requested injunctive relief where, as here, the matter at issue is one of peculiarly local interest. Def.Mem. IV at 3 (citing *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943)). The Court agrees with this reasoning and finds that this alleged failure to obtain an Art. 1 Ch. 3 permit is not properly before this Court.

Alternatively, even if this Court were to consider plaintiffs' position on the merits, the Court would hold as a matter of law that the proposed changes to the parking garage do not necessitate a new permit. Rights to non-conforming use are not affected by a change in ownership of the structure, ZR § 52–31; *see e.g., North Fork Motel, Inc. v. Grigonis*, 93 A.D.2d 883, 461 N.Y.S.2d 414, 415 (2d Dep't.1983); nor does the change from self-park to valet parking appear to be of significance in this zoning scheme, ZR §§ 12–10, 32–17. Moreover, defendants have presented uncontested evidence that the Coliseum garage's active operations will not cease for two successive years, the amount of time required to constitute an abandonment of the right of non-conforming usage. Letter from John E. Zuccotti to Charles M. Smith, Jr., Commissioner of Building, dated April 14, 1989 (hereinafter "Zuccotti Letter") (attached as Exhibit B to Affidavit of David Bellman, dated November 21, 1989) (hereinafter "Bellman Aff."), at 2; *see* ZR § 52–61

(cessation of active operation of non-conforming use for continuous period of two years extinguishes right to continue prior non-conforming use). Finally, nothing in the Wurmfeld Affidavit introduced by plaintiffs contradicts defendants' evidence that the structural alterations of the garage will be made only to accommodate structural alterations of the building above. Zuccotti Letter at 2. The present Coliseum, which itself is at least in part a non-conforming use, would be replaced by the Project, which would be a conforming use. Alterations may be made in a building substantially occupied by a non-conforming use only if the alterations are made "in order to accommodate a conforming use." ZR § 52-22; *see also* ZR § 52-31 (non-conforming use may be changed to any conforming use). The City and its agencies reviewed and approved of the continuation of the garage and its alteration as a non-conforming use. See Letter of Cornelius F. Dennis, Deputy Commissioner, Department of Buildings of the City of New York, to John E. Zuccotti, Esq., dated May 15, 1989 (attached as Exhibit C to Bellman Aff.). That ruling was based on § 52-22, permitting the alteration as a non-conforming use, rather than § 52-531, precluding the continuation of non-conforming uses.[13] Plaintiffs therefore present no genuine issues of material fact as to a repudiation of the SIP or violation of state law based on that ruling.[14]

The Court grants defendants' motion for dismissal or summary judgment as to that part of the CAA claim referring to an Article I Ch. 3 permit, and denies plaintiffs' motion for summary judgment on that issue.

To summarize thus far, the Court grants summary judgment and injunctive relief to plaintiffs as to the first part of the first claim, but denies summary judgment to plaintiffs on the remainder of this claim and instead grants summary judgment to defendants as to this cause of action.

## II. NYC Zoning Resolution Violations.

Plaintiffs' second cause of action alleges that the City's failure to obtain the two garage permits listed in sections (I)(B) and (I)(C), *ante*, was arbitrary, capricious and an abuse of discretion under Article 78 of New York's CPLR. Defendants and plaintiffs cross-move for summary judgment. Plaintiffs agree that this claim stands or falls with the Court's resolution of the identical issues presented above in the context of the CAA claim. Pl.Mem. I at 33.

For the reasons stated above in connection with the second and third parts of plaintiffs' first cause of action, there has been no violation of state law with respect to defendants' failure to obtain these permits. The Court will grant defendants' motion for summary judgment on this second cause of action and deny same to plaintiffs.

## III. Violation of IDA Mandate.

▮ Plaintiffs, suing as "citizens and taxpayers" (Complaint ¶ 9) allege for their third cause of action that NYC IDA is illegally involved in a "residential" project. *Id.* ¶ 94. Defendants have moved for dismissal or summary judgment on the bases that (1) plaintiffs have no standing to raise this claim, and (2) in any event the rule against IDA participation in residential projects would not bar this transaction. Plaintiffs cross-move for summary judgment.

NYC IDA was created pursuant to New York's General Municipal Law (hereinafter "GML") to promote and attract business development. GML § 917. However, the Legislature directed that such development was not to be at the expense of the viability and integrity of residential communities. *Id.* Section 917(c) of NYC IDA's enabling statute provides that it shall not have the power to construct or rehabilitate any residential structure of any kind, and that the

---

**13.** Plaintiffs admit as much. *See* Pl.Mem. II at 22.

**14.** The Court does not reach the issue of whether plaintiffs would need to and should be permitted to amend their complaint to reflect their claim of violation of the CAA through ZR § 52-531.

agency is not supposed to use its funds to further the construction of any residential facility.

The Project is approximately 40% residential and 60% commercial. Plaintiffs cite to § 12–10 of the Zoning Resolution for its rule that a building is "designed for residential use" if at least 25% of the floor area is residential. Defendants point to a different definition of the term "residential," as incorporated into GML § 917 (the statute that purportedly bars IDA from constructing residential facilities), which says that the non-residential portion of mixed-use buildings is not "residential." *See* GML § 917(j); ZR 12–10. Plaintiffs seek to annul NYC IDA's May 4, 9, and 10, 1989 resolutions approving the Project and its financing. Complaint ¶¶ 92–100.[15]

The Court does not reach the merits of this issue because of plaintiffs' lack of standing. New York expressly prohibits its citizens from challenging in a citizen taxpayer suit:

> the authorization, sale, execution or delivery of a bond issue ... by the state or any agency, instrumentality or subdivi-

sion thereof or by any public corporation or public benefit corporation.

State Finance Law § 123–b(1). Insofar as the basis of these citizen-taxpayers' lawsuit is NYC IDA's allegedly wrongful issuance of bonds, their cause of action is barred by State Finance Law § 123–b(1).

Defendants provide uncontradicted evidence that NYC IDA's participation in the Project revolves around its issuance of bonds. In this situation, as is apparently typical of NYC IDA's participation in industrial development projects, the developer transfers to NYC IDA the title to the real estate upon which the Project is to be constructed. The developer receives a long-term leaseback from NYC IDA, which in turn issues tax-exempt bonds and sells them to a bank or other financial institution. When the bonds have been paid in full, NYC IDA reconveys the property to the developer for one dollar. Affidavit of John Doherty, dated October 6, 1989 (hereinafter "Doherty Aff."), ¶¶ 3–4. With this affidavit, defendants have carried their initial burden of demonstrating an absence of genuine issues of material fact that the sale and leaseback with tax exemptions all flow from the issuance of the IDA bonds.

---

**15.** The parties' arguments on the merits of this cause of action evolved over the course of several rounds of briefing. They are summarized here for the sake of completeness, although the Court does not address them because of its disposition of the standing issue, *post*.

Plaintiffs contend that by statute, the Condominium Act contained in New York's Real Property Law prohibits conveyance of any condominium units until they have been built. § 339–p. They therefore argue that until the building is built, IDA is "some form of joint owner/sponsors" of the project. Defendants argue that the Condominium Act does not forbid the City from *creating* and *declaring* separate air space condominium units before they are built. At the closing, the TBTA will convey to the NYC IDA and Coliseum Associates separate condominium units—*i.e.*, separate fee interests—each consisting of a precisely defined portion of the air space above the land. NYC IDA will receive a deed for the air space in which the commercial portion of the proposed building will be constructed, and Coliseum Associates will receive a deed for the air space above the commercial portion, where the residential floors are to be constructed.

Condominium Act § 339–p indicates that a set of the floor plans "as built" must be filed with

the building department "prior to each first conveyance." Accordingly, the nature of IDA's interest in the building between the date of closing and the date the building is completed is unclear. Plaintiffs wish the Court to conclude that IDA owns an undivided "joint ownership" in a residential building between the date of the closing and the date the building is complete, and that therefore the project violates IDA's enabling legislation. Defendants respond that the New Agreement takes pains to declare that NYC IDA is neither owning nor financing any residential part of the building, and further declares that no proceeds from any IDA bond is to inure to the benefit of the private developer on account of its construction of the residential condominium unit. Defendants argue that the project will be two "common law condominiums," with IDA taking title only to the commercial condominium. Plaintiffs' response is that the common law of condominiums was superseded by statute, the Condominium Act. Moreover, they argue, it is one building with common elements—roof, foundations, structural supports, walls, etc., constituting one project with one purchase price. They seek a ruling that as a matter of law, NYC IDA's involvement in that one building furthers the construction of residential facilities in violation of NYC IDA's statutory mandate.

In response, plaintiffs protest that "the bond issue is collateral and peripheral to plaintiffs' claim." However, they provide no factual support for their position that IDA is participating in any other capacity,[16] Pl.Mem. I at 39, nor any legal authority for the proposition that they have standing to challenge those purported other aspects of IDA's participation. *Id.* 37–39. They instead rely on the absence of precedent as a possible "indication of either the extent to which IDA is, here, exceeding its powers or the extent of the barriers to review." *Id.* at 37. However, the Deputy Executive Director of NYC IDA indicates that IDA has participated without challenge in the commercial portion of other mixed-use residential and commercial projects, *e.g.*, the Zeckendorf Towers project. Doherty Aff. ¶ 8. As a matter of law, plaintiffs are barred from challenging NYC IDA's participation in this Project because of State Finance Law § 123(b)–(1).

Plaintiffs ask the Court to look beyond the bond aspect of the Project and consider that they have common-law taxpayer standing because the $47 million tax subsidy is a "cost" to taxpayers, who must make up the difference in the state's and city's budgets, and because without taxpayer standing there might be no judicial review of this action by the NYC IDA. Pl. Mem. I at 35, 37 (citing *Boryszewski v. Brydges*, 37 N.Y.2d 361, 363–364, 372 N.Y.S.2d 623, 625–626, 334 N.E.2d 579, 580–581 (1975)).

The operation of State Finance Law § 123–b(1) precludes citizens from using common-law taxpayer standing to challenge bond issues. *New York State Coalition for Criminal Justice, Inc. v. Coughlin*, 64 N.Y.2d 660, 485 N.Y.S.2d 247, 474 N.E.2d 607 (1984); *Wein v. Comptroller*, 46 N.Y.2d 394, 413 N.Y.S.2d 633, 386 N.E.2d 242 (1979). Even if the Court were

to find that NYC IDA participated in the Project through some mechanism other than the bond issue, plaintiffs would nonetheless lack standing under the residuum of State Finance Law § 123–b(1). That provision grants taxpayer standing in non-bond-issue cases only where there is an allegation of wrongful "expenditure, misappropriation, misapplication or any other illegal or unconstitutional disbursement of state funds or state property." As previously established, NYC IDA does not expend public funds, extend the credit of the City or State, or guarantee the bonds. Doherty Aff. ¶ 7. Although it does offer certain tax incentives to developers with whom it participates,[17] plaintiffs cite no authority for the proposition that such a tax abatement would qualify as a wrongful disbursement of state funds for purposes of taxpayer standing; indeed, there is case law to the contrary. *See Erie County Indus. Dev. Agency v. Roberts*, 94 A.D.2d 532, 465 N.Y.S.2d 301, 306 (4th Dep't 1983), *aff'd*, 63 N.Y.2d 810, 482 N.Y.S.2d 267, 472 N.E.2d 43 (1984). Moreover, as to plaintiffs argument that NYC IDA should not be permitted to avoid citizen lawsuits challenging its participation in projects by portraying itself as a mere issuer of bonds, the *Wein* case, which was decided after *Boryszewski* and with that case in mind, mandates that result. 413 N.Y.S.2d at 634, 386 N.E.2d at 242 *et passim*.

Plaintiffs' attempt to invoke standing as residents of the area near the Project must also fail. There is no logical nexus between their status as neighborhood residents and their challenge to NYC IDA's role in the financial structure of the transaction. *See, e.g., Barnes v. Binghamton Urban Renewal Agency*, 127 Misc.2d 859, 487 N.Y.S.2d 519, 522 (Sup.Ct.Broome Co. 1985); *cf. Urban League of Rochester, Inc. v. County of Monroe*, 49 N.Y.2d 551, 556, 427 N.Y.S.2d 593, 595, 404 N.E.2d 715, 717

**16.** For example, NYC IDA is neither incurring obligations of the City or State, expending public funds nor extending public credit. Doherty Aff. ¶ 7. Moreover, the Agency itself bears none of the risk of loss, nor does it stand to gain from the transaction. *Id.*

**17.** In this case, the interest on the bonds to be issued by the IDA will be subject to income taxation, although no taxes for mortgage recording, property sales, or other sales will be assessed. The net value of these tax exemptions or reimbursements guaranteed to the developer is $47 million. Affidavit of Ross Graham, Esq., dated November 3, 1989, at ¶ 3.

(1980) (no citizen-taxpayer standing to challenge nonfiscal activities of municipal government agencies).

For the reasons stated above, plaintiffs have no standing to raise their third cause of action and it must be dismissed. Plaintiffs' motion for summary judgment is correspondingly denied.

## IV. Violation of NYC IDA Regulations and Policies.

 In the fourth cause of action, plaintiffs claim that NYC IDA arbitrarily and capriciously violated its own regulations and policies by, *inter alia:* (1) considering the Project without expressions of interest by prospective tenants of at least 50% of the floor area; (2) failing to obtain pre-lease agreements from the prospective tenants of at least 50% of the floor area; (3) participating in a retail project without the City applying for Urban Development Action Grants; and (4) participating in the project unless the project would not be economically feasible without industrial bond financing and benefits. Complaint ¶ 97. Defendants move to dismiss on the basis that plaintiffs have no standing to raise these objections; that the rules are an unpublished, non-binding internal policy of NYC IDA; and that, in any event, the applicable rules were complied with. *See* Def.Mem. I at 51–55; Doherty Aff. at ¶¶ 11–14; New York City Industrial Development Agency, *Commercial Project Policy,* attached as Exhibit B to Doherty Aff., at 2. In response, plaintiffs appear to abandon those arguments and focus instead on the original Request for Proposals which provided that the developer would not seek a tax exemption. Pl.Mem. I at 51–52. However, the first page of that Request, dated February 1985, states that "Sponsor reserves the right, in its sole discretion, to negotiate and dispose of the Site on terms other than those set forth herein." Harris Supp.Aff., Exh. A at 1. Defendants point out that since that date, the Project has had to be restructured and reduced by .5 million sq. ft. because of, *inter alia,* a ruling in *Municipal Art Society, supra* at n. 3, challenging the zoning bonus grant that was part of the original Project plans. 137 Misc.2d 832, 522 N.Y.S.2d 800 (1987). At that stage, NYC IDA's participation in the commercial portion was proposed in order to make the revised Project economically feasible. Doherty Aff.Exh. A at 5.

Plaintiffs offer no evidence, documentary or testamentary, to rebut defendants' prima facie showing that the administrative determination to alter the no-tax-exemption aspect of the Request For Proposals was not arbitrary and capricious. They merely state their disbelief that NYC IDA's assistance is necessary to the Project in light of the prime value of the underlying real estate at Columbus Circle. Pl.Mem. I at 52 ("to say that the development is not feasible without IDA assistance is, bluntly, hogwash"). Such expressions of doubt, however intuitively appealing, are insufficient to meet plaintiffs' shifted burden of showing the presence of genuinely disputed factual issues. *Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. at 2510 (1986). This Court will not review the wisdom of a considered decision by NYC IDA on such a basis. *See Grossman v. Herkimer County Indus. Dev. Agency,* 60 A.D.2d 172, 400 N.Y.S.2d 623, 626 (4th Dep't 1977) (whether or not IDA project resulted in optimum use of site is immaterial as long as project was within scope of IDA's purposes and powers).

The Court will grant summary judgment to defendants on this fourth cause of action for the reasons stated above.

## V. Violation of Conflict-of-Interest Laws.

 Plaintiffs claim in their fifth cause of action that a former MTA employee, Robert Selsam, represented Boston Properties before the MTA in connection with this Project within two years of the end of his MTA service. Complaint ¶ 103. They also allege that during his tenure at the MTA, Selsam participated in the planning for the improvement of the 59th Street–Columbus Circle subway station which was to be required of the developer of the Coliseum site. *Id.* at ¶ 104. Plaintiffs assert that this action violates New York's Public Officers Law (hereinafter "POL") § 73(7) and

requires annulment of the New Purchase Agreement. Defendants reply that the claim is time-barred, that the allegations are substantively untrue, and that even if true, such a conflict of interest would not void the entire Project.

Article 73 of New York's POL provides in relevant part:

No ... state officer or employee, other than in the proper discharge of official duties, ... shall receive, directly, or indirectly, or enter into any agreement express or implied for, any compensation, in whatever for, for the appearance or rendition of services by himself or another in relation to any case, proceeding, application or other matter before a state agency where such appearance or rendition of services is in connection with:

(i) the purchase, sale, rental or lease of real property, goods or services, or a contract therefor, from to or with any such agency....

§ 73(7)(a).[18] A violation of Section 73 may be punished as a misdemeanor. § 73(14); *N.Y. State Urban Development Corp. v. Vanderlex Merchandise Co.*, 98 Misc.2d 264, 413 N.Y.S.2d 982, 989 (N.Y.Sup.Ct. 1979). The *Vanderlex* court indicated that although in some instances corrupt practices may render contracts void or voidable, such practices would not operate to void the legislative act of any agency. *Id.* In this instance, the defendants' resolutions of May 4, 9, and 10, 1989, approving the Project, were legislative, rather than adjudicative, acts. *Id.* (citing *Matter of Kew Gardens Sanitarium, Inc. v. Whalen*, 55 A.D.2d 226, 228, 390 N.Y.S.2d 256, 258 (3d Dep't 1976), *aff'd* 43 N.Y.2d 675, 401 N.Y.S.2d 65, 371 N.E.2d 827 (1977)). As the *Vanderlex* court stated:

It is difficult to see how the "legislation" of a public corporation pursuant to which public agencies have acted, millions of dollars have been spent and the character of an area, neighborhood or even a whole City has been altered can be halted or reversed because of a violation of Section 73 or 74 of the Public Officers Law.

413 N.Y.S.2d at 989.

Plaintiffs point to a federal remedy of contract avoidance in the event of breach of federal conflict of interest laws, asking the Court to imply such a remedy in the present situation. Pl.Mem. I at 54 (citing *United States v. Medico Industries, Inc.*, 784 F.2d 840, 845 (7th Cir.1986) and *United States v. Mississippi Valley Generating Co.*, 364 U.S. 520, 563, 81 S.Ct. 294, 316, 5 L.Ed.2d 268 (1960)). The Court concludes that such a step would be unwarranted in light of the policy considerations articulated above.[19]

Because plaintiffs cannot state a claim upon which relief can be granted with respect to POL § 73(8), this cause of action shall be dismissed. Accordingly, the Court does not reach defendants' other bases for dismissal of this cause of action.

## VI. Federal Housing Act and HUD violations.

As stated in the Court's previous Memorandum Opinion and Order, plaintiffs have conceded that their sixth cause of action is not viable. *Columbus Center I*, 750 F.Supp. at 95, 96 n. 6. There is uncontested evidence before this Court, in the form of a letter from Regional Counsel to the U.S. Department of Housing and Urban Development, that that agency's predecessor issued a Certificate of Completion to the City regarding Federal Housing Act requirements for the Columbus Circle site some 25 years ago. Letter of John P. Dellera, dated October 2, 1989, attached as page 30 to Def.Mem. I.

---

**18.** § 73(8) provides in relevant part:

No person who has served as a state officer or employee shall within a period of two years after the termination of such service or employment appear or practice before such state agency or receive compensation for any services rendered by such former officer or employee on behalf of any person, firm, corpora-

tion or association in relation to any case, proceeding or application or other matter before such agency.

**19.** The Court does not reach the merits of plaintiffs' allegations with respect to Selsam's behavior.

The statute and handbook referred to in plaintiffs' sixth cause of action are concededly inapplicable to this Project, and that cause of action shall be dismissed.

## CONCLUSION

There being no genuine issues of material fact in need of resolution at trial, the Court disposes of this matter on summary judgment. The Court grants plaintiffs' motion for summary judgment as to that part of their CAA claim arising from defendant City of New York's failure in its SIP commitment § 3.6(A). The Court correspondingly denies that aspect of defendants' motion for dismissal or summary judgment. The Court grants defendants' motion insofar as it relates to the remainder of the first claim, as well as the second, third, fourth, fifth, and sixth causes of action. The Court correspondingly denies plaintiffs' cross-motion for partial summary judgment for the balance of the first claim as well as their second and third claims.

Plaintiffs' motion for partial summary judgment granted in part, with injunctive relief, and denied in part; defendants' motion for dismissal or summary judgment granted in part and denied in part.

SO ORDERED.